No. 61,040

THE CITY OF ARKANSAS CITY, KANSAS, *et al., Plaintiffs/Appellees,* v. A. SCOTT ANDERSON, *et al., Defendants,* v. MID-AMERICA TITLE COMPANY, INC., *Garnishee/Defendant,* and HESSTON STATE BANK, *Interpled Party/Appellant,* and THE UNITED STATES OF AMERICA, acting through Farmers Home Administration, *Interpled Party.*

(752 P.2d 673)

Opinion filed March 25, 1988.

*W. Y. Chalfant*, of Branine, Chalfant & Hill, of Hutchinson, argued the cause and was on the brief for appellant, Hesston State Bank.

*Kenneth C. Jones*, of Watson, Ess, Marshall & Enggas, of Olathe, argued the cause, and *Thomas E. Ruzicka*, of the same firm, was with him on the brief for appellees, The City of Arkansas City, Kansas, and Southwest National Bank.

The opinion of the court was delivered by

HOLMES, J.: The Hesston State Bank (Hesston) appeals from a summary judgment in favor of the City of Arkansas City, Kansas, (Arkansas City) and Southwest National Bank, Wichita, Kansas, (Southwest National) on competing claims to funds otherwise payable to A. Scott Anderson and E. Sylvia Anderson (the Andersons).

While the facts are essentially undisputed, they are complex and crucial to a full understanding of the issues on appeal. Therefore, they will be set forth in some detail. On July 6, 1984, Arkansas City and Southwest National obtained a judgment against the Andersons and others in an amount in excess of two million dollars. The amount of the judgment and its validity are not in dispute here. The present appeal involves only one of many attempts by appellees to recover on their judgment. The Andersons, along with Herbert L. Ketterman and Grace Ketterman (the Kettermans), were involved in numerous business dealings including ownership of the Main Corporation, K-A Corporation, and numerous partnerships, one of which was Land Opportunities Co.

Land Opportunities Co. was a partnership composed of the Andersons and the Kettermans. Its sole asset consisted of real property in Johnson County, and its sole purpose was to sell the

property and divide the proceeds among the partners. In 1983 a portion of the property was sold to Goode Construction Co., Inc., (Goode) and on July 3, 1984, Land Opportunities Co. granted Goode an option to purchase the balance of the property. The option had an expiration date of July 1, 1986. Prior to the expiration date Goode gave notice that it would exercise its option and purchase the remainder of the property.

In the meantime the Andersons and the Kettermans decided to go their separate ways. A number of their joint business ventures had been financed by Hesston, and in early 1985 the Andersons sought to divide and separate their liability to Hesston from that of the Kettermans. On April 22, 1985, the Andersons and Hesston reached agreement on a plan to refinance the Andersons. As a part of that agreement, a new note in the amount of $97,256.85 was executed to Hesston by the Andersons. They were then released from the loans and indebtedness for which they and the Kettermans had been jointly responsible. As a part of the April 22, 1985, refinancing Hesston required that the Andersons execute an assignment of any partnership proceeds which they might receive as a result of the Goode option. The assignment reads:

### "ASSIGNMENT

"In consideration for loan this date in the amount of Ninety-Seven Thousand Two Hundred Fifty-Six and 85/100 Dollars ($97,256.85), we hereby assign to the Hesston State Bank, Hesston, Kansas, proceeds from our interest in the sale of real estate specifically described in the Option Agreement attached hereto dated July 3, 1984, between Land Opportunities Co., a partnership, in which we are partners, and James A. Goode Construction Company, Inc., buyer.

Dated this 22nd day of April, 1985.

/s/ A. Scott Anderson
A. Scott Anderson

/s/ E. Sylvia Anderson
E. Sylvia Anderson"

The assignment was acknowledged before a notary public and was placed of record in the office of the Johnson County register of deeds on November 13, 1985. Mortgage registration tax in the amount of $243.25 was paid at the time of recording.

On November 27, 1985, Arkansas City and Southwest National

obtained from the district court a charging order (K.S.A. 56-328) against the Andersons' partnership interest in Land Opportunities Co. and several other partnerships. The charging order was served upon Land Opportunities Co. on January 23, 1986. On July 31, 1986, Hesston, evidently having knowledge that Goode had exercised its option to purchase the Johnson County property, filed a Uniform Commercial Code financing statement with the office of the Secretary of State out of what Hesston asserts was "an abundance of caution." The financing statement specifically covered the April 22, 1985, assignment.

Mid-America Title Company, Inc., of Olathe (Mid-America) was the closing agent for the completion of the sale of the real estate by Land Opportunities Co. to Goode. On August 12, 1986, Arkansas City and Southwest National obtained an order of garnishment which was served upon Mid-America seeking the Andersons' share, if any, of the Goode option proceeds. Mid-America responded to the garnishment order, paid the sum of $103,449.21 into court, asked that all persons or entities that claimed any interest in the funds be brought in by interpleader, and requested that it be relived of all further liability or responsibility. Hesston then became a party by way of interpleader and asserted it had a first claim upon the money paid in by reason of the assignment which was executed April 22, 1985. Arkansas City and Southwest National contended that Hesston's assignment was actually only a security interest and because a financing statement was not filed with the Secretary of State's office until July 31, 1986, the charging order served upon Land Opportunities Co. on January 23, 1986, had priority.

Arkansas City and Southwest National filed a motion for summary judgment, as did the Andersons. Hesston responded, and on May 21, 1987, the trial court rendered an extensive and well-reasoned memorandum decision which granted summary judgment to Arkansas City and Southwest National. The trial court found that the "assignment" from the Andersons granted Hesston only a security interest which was not perfected until the financing statement was filed with the Secretary of State's office in July 1986. The court also found that the claims of appellees, based upon the charging order, had priority over the claim of Hesston and ordered the clerk to pay the funds to

appellees. Hesston has appealed. The case was transferred from the Court of Appeals to the Supreme Court pursuant to K.S.A. 20-3018(c).

By way of summary and in an attempt to clarify the chronology of events, the following appear to be the controlling dates:

| | |
|---|---|
| July 6, 1984 | Judgment in favor of Arkansas City and Southwest National against the Andersons. |
| April 22, 1985 | Assignment, note, and agreement executed by the Andersons in favor of Hesston. |
| November 13, 1985 | The Andersons' assignment to Hesston recorded with Johnson County Register of Deeds. |
| November 27, 1985 | Charging order issued by the district court. |
| January 23, 1986 | Charging order served upon Land Opportunities Co. |
| July 31, 1986 | Financing statement filed by Hesston with Secretary of State. |
| August 12, 1986 | Appellees' garnishment order served upon Mid-America. |

Hesston raises the following issues on appeal:
(1) Whether there were material facts in dispute which precluded summary judgment;
(2) whether the district court erred in holding that the April 22, 1985, assignment by the Andersons in favor of Hesston was intended as security for the note;
(3) whether the charging order issued by the court pursuant to K.S.A. 56-328 provided appellees with rights superior to those of Hesston; and
(4) whether Hesston's failure to timely file its financing statement subordinated its rights to those of the prior judgment creditors, who obtained and served a charging order after the date of the assignment but before a financing statement was filed.

At the outset we wish to emphasize that this appeal and our opinion only address the controversy between Arkansas City and

Southwest National on one hand and Hesston on the other. There were other defendants in addition to the Andersons, but neither they nor the Andersons are involved in this appeal. Land Opportunities Co. is not involved in this appeal nor is the partnership real estate in Johnson County. Creditors of the partnership, if any, and other partners and other creditors are not involved in this appeal. The sole issue in this appeal is the priority of the respective rights, if any, of the parties to this appeal, as between themselves, to such portion of the funds held by the clerk that otherwise would have been distributable to the Andersons from Land Opportunities Co. as a result of the sale of the partnership real estate to Goode.

We turn first to the issue of whether there are material unresolved facts which preclude summary judgment. In addressing this issue the learned trial judge stated, in part:

"The first question to be decided is, of course, whether there remain in issue material facts which preclude the entry of summary judgment. Though the Bank [Hesston] has not asked for summary relief, it was agreed at oral argument of the motions of plaintiffs and defendants Anderson that production of evidence would not establish facts not otherwise disclosed by the written instruments which are attached to the motions and are exhibits in the deposition of Robert Showalter, President of the Hesston State Bank, or in the deposition testimony of Robert Showalter.

"Plaintiffs and defendants Anderson have sparred a little over what facts from the record are uncontroverted, but there are no facts in controversy which are material to the issues of whether the assignment to the Bank was absolute or simply created a security interest and, if the transaction between the Bank and defendants Anderson is properly construed as creating a security interest, whether the Bank was required to perfect its security interest by filing a financing statement in order to establish priority over the lien of the charging order."

The basic issue presented to the trial court and to this court is whether the assignment and related documents constituted an absolute assignment or merely created a security interest. While Hesston did not file a motion for summary judgment, it participated fully by responding to the motions filed by the principal parties, filing briefs, and participating in oral arguments. The real issue is the construction of the various documents surrounding the Andersons' assignment to Hesston. This court has held that the legal effect of a written instrument is a question of law for the court to decide and, regardless of the construction

made by the trial court, on appeal a written instrument or contract may be construed and its legal effect determined by the appellate court. *Patrons Mut. Ins. Ass'n v. Harmon,* 240 Kan. 707, 713, 732 P.2d 741 (1987); *Cornwell v. Jespersen,* 238 Kan. 110, Syl. ¶ 6, 708 P.2d 515 (1985). We agree with the trial court that there were no material controverted facts which would preclude the entry of summary judgment and the court was correct in determining the case was ripe for summary judgment.

We now turn to the issue of whether the April 22, 1985, assignment was an actual assignment or whether it was given as security for the note. The trial court held that the assignment was intended to grant only a security interest. Hesston argues it was an "absolute" assignment and not a mere security interest. It argues that the intent of the parties, the Andersons and Hesston, was to create an absolute assignment of the proceeds to be derived from the Goode real estate option contract.

At the outset it is necessary to determine just what interest of the Andersons was subject to the purported assignment. The assignment was set forth in its entirety earlier in this opinion and the operative portion thereof reads, "[W]e hereby assign to the Hesston State Bank, Hesston, Kansas, proceeds from our interest in the sale of real estate." The real estate referred to was owned by Land Opportunities Co. and the Andersons, individually, had no direct ownership interest in the property. A determination of the interest of the Andersons as partners in Land Opportunities Co. is governed, in part, by the Kansas Uniform Partnership Act, K.S.A. 56-301 *et seq.*

K.S.A. 56-324 through 56-327 deal with a partner's property rights in a partnership. K.S.A. 56-324 provides that the property rights of a partner are of three types:

"(1) The partner's right in specific partnership property, (2) his or her interest in the partnership, and (3) his or her right to participate in the management."

K.S.A. 56-325 covers the first category: a partner's right in specific partnership property. The statute provides that partners are co-owners of specific property of the partnership, which they hold as "tenant[s] in partnership." K.S.A. 56-325(a). Subsection (b) sets forth the incidents of such a tenancy, including the fact that a partner may not assign his right in specific partnership

property "except in connection with the assignment of rights of all the partners in the same property." Since the other partners in Land Opportunities Co. did not, so far as we know, execute an assignment of their proceeds from the option contract, the Andersons were precluded by statute from assigning the option contract itself or its cash proceeds as *specific partnership property*. K.S.A. 56-325(b); *Wellsville Bank v. Nicolay*, 7 Kan. App. 2d 172, 174-75, 638 P.2d 975 (1982). This court has recently noted that the assignee of a contract interest acquires no greater rights from the assignment than those possessed by the assignor. See *H. Freeman & Son v. Henry's, Inc.*, 239 Kan. 161, 163, 717 P.2d 1049 (1986).

K.S.A. 56-326 provides:

"A partner's interest in the partnership is his or her share of the profits and surplus, and the same is personal property."

K.S.A. 56-327, however, does permit a partner to assign his or her interest in the *partnership itself*, but such an assignment "merely entitles the assignee to receive in accordance with his or her contract the *profits* to which the assigning partner would otherwise be entitled." K.S.A. 56-327(a) (emphasis added); *Wellsville Bank v. Nicolay*, 7 Kan. App. 2d at 175. The extent of the profits to which a partner may be entitled is controlled by the agreement of the partners and K.S.A. 56-318, which provides in part:

"The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:

(a) Each partner shall be repaid his or her contributions, whether by way of capital or advances to the partnership property and share equally in the *profits and surplus remaining after all liabilities, including those to partners, are satisfied;* and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the partner's share in the profits." (Emphasis added.)

Thus, it appears clear that the interest assigned to Hesston could not constitute an interest in the real estate itself or in the Goode option contract and would cover only the Andersons' distributive share of partnership profits resulting from the sale of the property. However, under the facts and circumstances of this case, the issue is simplified somewhat as it appears the Andersons' distributive share of partnership profits and their share of

the proceeds from the Goode real estate purchase are one and the same.

In determining the true meaning of the assignment, the intent of the parties to the assignment as determined by all the surrounding facts and circumstances, including the documents, is controlling. When all of the documents are read together, along with the treatment given to them by Hesston, it appears clear to us that the assignment was given as security for the note and created a security interest under the Uniform Commercial Code (UCC), K.S.A. 84-1-101 *et seq.*

The UCC defines "security interest" as follows:

" 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation." K.S.A. 1987 Supp. 84-1-201(37).

The 1983 Kansas Comment to 84-1-201(37) reads in part:

"The term 'security interest' is defined in very broad terms. Most security interests arise from security agreements entered into under Article 9. See Kansas Comment 1983 to 84-9-102. The intent of the parties to a particular transaction is the key, and many arrangements in other formats constitute 'security interests' within this definition."

In determining the intent of the parties, certain general rules of construction must be considered. In *New Hampshire Ins. Co. v. Fox Midwest Theatres, Inc.,* 203 Kan. 720, Syl. ¶ 1, 457 P.2d 133 (1969), it was held:

"The primary rule in construction of any contract is to ascertain the intent of the parties, and such intent may best be determined by looking at the language employed and taking into consideration all the circumstances and conditions which confronted the parties when they made the contract."

In *Hall v. Mullen,* 234 Kan. 1031, Syl.¶ 4, 678 P.2d 169 (1984), the court held:

"Where two or more instruments are executed by the same parties at or near the same time in the course of the same transaction and concern the same subject matter, they will be read and construed together to determine the intent of the parties."

The Andersons, who were jointly indebted to Hesston along with the Kettermans and some of their other joint business ventures, sought to refinance their obligations to Hesston and to be relieved of liability for the Kettermans' share of the indebtedness. To accomplish this several documents were executed

which must be read together to determine the true nature and intent of the assignment. They include the agreement between the parties, the note, the financing statement, and the assignment. The agreement dated April 22, 1985, provides in part:

"WHEREAS, A. Scott Anderson is indebted to the Hesston State Bank of Hesston, Kansas on certain loans in conjunction with Dr. Herbert Ketterman; and

"WHEREAS, the *Hesston State Bank desires to take a secured position* with regard to the indebtedness; . . . .

. . . .

NOW, THEREFORE, *the parties agree* as follows:

. . . .

"2. A. Scott Anderson and E. Sylvia Anderson will give to the Hesston State Bank an assignment of their right to proceeds from the sale of property in Johnson County, Kansas with the deed held by Land Opportunities Co. in which the Andersons are partners. An assignment dated April 22, 1985 has been executed.

. . . .

"5. The assignment to the Bank of the right of the Andersons to proceeds of sale of the real estate described in the Assignment and the attached Option Agreement will be to the extent of principal and interest on the . . . ($97,256.85) note. *At any time that note is paid in full, both principal and interest, the Assignment will be released.* All proceeds from the Andersons' interest in the sale of the real estate described in the Assignment will be paid to the Hesston State Bank until such time as the note, both principal and interest, is paid in full." (Emphasis added.)

The promissory note signed by the Andersons was also dated April 22, 1985, and was on a form prepared or furnished by Hesston. The printed terms of the note clearly call for security and purport to grant the bank a security interest in the collateral described in the note. After reciting the details as to parties, amount, interest rate, and due date, the note provides in part:

"For the purpose of securing the payment of this note . . . the undersigned hereby pledge(s), transfer(s), and deliver(s) the property hereinafter described, and grant(s) a security interest in favor of the Bank therein . . . :

secured by assignment of proceeds—(Land Opportunities Company, a partnership)

also hereby granting the Bank a security interest in any property or moneys of the undersigned now or hereafter in the possession of said Bank, and agree(s), upon notification, to give such additional security as may be required . . . ."

The note then goes on to refer to the "security so pledged," waives any exemptions, authorizes "sale of said security," and provides the Andersons shall be liable for any deficit and that Hesston shall pay any surplus to the Andersons. The note spe-

cifically provides that it is subject to the Kansas Uniform Commercial Code. The note clearly contemplates that the assignment of the real estate proceeds is security for payment of the loan.

The Andersons also executed a UCC financing statement which refers to Hesston as the "secured party" and after describing the real estate refers to "proceeds assigned under date of 22 April 1985." The financing statement was filed by Hesston with the office of the Secretary of State on July 31, 1986. See K.S.A. 1987 Supp. 84-9-401(1)(c).

It should also be noted that the assignment was recorded in the real estate records of the Johnson County register of deeds' office on November 13, 1985. The mortgage registration tax was paid based upon the full amount of the note. Apparently, at that point, Hesston considered the assignment created an interest in the nature of a lien or mortgage on the Land Opportunities Co. real estate. See K.S.A. 79-3101 *et seq.*

The testimony of the president of Hesston, in his deposition, indicated that the assignment was security for the note and that Hesston's security under the prior joint obligations, which were being separated and refinanced, was running "a little shy." The Andersons' attorneys, in seeking to refinance their clients' indebtedness to Hesston, wrote that the Andersons "will give the bank security for payment on that note," referring to the anticipated new note.

The trial court relied upon a number of factors in reaching its conclusion that the assignment was actually a security interest. These factors, as stated by Hesston in its brief, were:

"(a) [T]he loan was not immediately shown as paid when the assignment was made; (b) Bank, as assignee, did not surrender its right to full payment of the debt and to recover any deficiency; (c) Bank would have had to account for any surplus in excess of the debt; (d) the agreement between Bank and Defendants provided that Bank would not have any interest in the real estate, only in the proceeds; (e) the Buyer of the optioned real estate was not notified of the assignment; (f) the term 'security' was used in the agreement and note; and (g) the correspondence from Defendants to Bank prior to the transaction and certain of the testimony at the discovery deposition of the Bank president, Robert Showalter, employed the term 'security.'"

The trial court extensively addressed each of these factors and, although we do not deem this list exhaustive, we find the factors were properly considered. See *In re Joseph Kanner Hat Co., Inc.*, 482 F.2d 937 (2d Cir. 1973).

A careful review of the record herein and the documents associated with the "assignment" makes it abundantly clear that only a security interest in the option contract proceeds was created and that, as to Arkansas City and Southwest National, the interest was not perfected until the filing of the financing statement on July 31, 1986. The trial court was correct in its determination that the assignment actually created a security interest which was subject to the provisions of the UCC.

The last two issues raised by Hesston are so intertwined they will be considered together. Essentially the issue raised is the effect of the charging order issued by the trial court in November 1985, and served upon Land Opportunities Co. on January 23, 1986. Does the charging order in this case give appellees a claim to the Goode option proceeds which is superior to that of Hesston? We hold that it does. Hesston does not challenge the validity of the charging order, but argues that it entitles the judgment creditors to nothing more from the partnership than the Andersons' interest in the real property proceeds at the time the charging order was issued or executed. Hesston argues that, as the Andersons had assigned to it their portion of the partnership interest represented by the funds paid into court, and since the assignment to Hesston preceded the issuance of the charging order, appellees could not reach those funds with the charging order because they no longer belonged to the Andersons. Since we have already determined that the assignment created only a security interest, we must determine the effect of the charging order and the priority, if any, of the competing claims.

K.S.A. 56-328 is a verbatim adoption of section 28 of the Uniform Partnership Act and provides:

"56-328. **Partner's interest subject to charging order.** (a) On due application to a competent court by any judgment creditor of a partner, the court which entered the judgment, order, or decree, or any other court, may charge the interest of the debtor partner with payment of the unsatisfied amount of such judgment debt with interest thereon; and may then or later appoint a receiver of his or her share of the profits, and of any other money due or to fall due to him or her in respect of the partnership, and make all other orders, directions, accounts and inquiries which the debtor partner might have made, or which the circumstances of the case may require.

"(b) The interest charged may be redeemed at any time before foreclosure, or in case of a sale being directed by the court may be purchased without thereby causing a dissolution:

(1) With separate property, by any one or more of the partners; or

(2) With partnership property, by any one or more of the partners with the consent of all the partners whose interests are not so charged or sold.

"(c) Nothing in this act shall be held to deprive a partner of his or her right, if any, under the exemption laws, as regards his or her interest in the partnership."

The history, application, and effect of the charging order is discussed at some length by Professor J. Gordon Gose in his article, *The Charging Order Under the Uniform Partnership Act*, 28 Wash. L. Rev. 1 (1953). In discussing the evolution of the charging order, Professor Gose states:

"One of the most artificial and confusing procedures of the common law was the method by which the creditor of a partner enforced his claim against the interest of his debtor in the partnership. Lord Justice Lindley of the English Court of Appeal, a most eminent authority on the law of partnership, aptly describes the common law procedures in the following language:

'When a creditor obtained a judgment against one partner and he wanted to obtain the benefit of that judgment against the share of that partner in the firm, the first thing was to issue a *fi.fa.*, and the sheriff went down to the partnership place of business, seized everything, stopped the business, drove the solvent partners wild, and caused the execution creditor to bring an action in Chancery in order to get an injunction to take an account and pay over that which was due by the execution debtor. A more clumsy method of proceeding could hardly have grown up.'

"Substantially the same procedure prevailed throughout the United States under general execution statutes where the successive steps generally consisted of: (1) seizure of some or all of the partnership property under writ of execution; (2) sale of the debtor partner's 'interest in the property'; (3) acquisition of the debtor partner's interest 'in the property' by the purchaser at the execution sale, subject, however, to the payment of partnership debts and prior claims to the firm against the debtor partner; (4) compulsory dissolution and winding up of the partnership; and (5) distribution to the execution purchaser of the debtor partner's share of any property remaining after the winding up process was completed.

"Two factors combined to bring about this 'clumsy method.' The first was the difficulty which courts and lawyers had in understanding the nature of a partner's interest in a partnership, that is, that it was an intangible share in the business of the firm rather than a direct interest in the property of the firm. Even when this concept was recognized, as it inevitably was when a separate creditor of a partner seized partnership property, the second factor came into play. The common law had no procedure for the seizure of the partner's intangible interest in the business. The writ of *fieri facias*, common law counterpart of the writ of execution, permitted seizure of physical property only. Since it was practically

inconceivable that valuable partnership interests should be exempt from creditors' claims, the writ of *fieri facias* was employed even though ill suited to the purpose.

"We thus find the common law courts enforcing claims against an intangible interest by a procedure commencing with the seizure of property but in its later stages converted into a proceeding whereby the debtor's beneficial interest in the business is made available to his creditor. The final result, however, could be attained only at the expense of the disruption of the business and the compulsory dissolution of the partnership. These consequences were not only unfair to the non-debtor partners but also harmful to the value of the partnership interest which the creditor sought to reach in that good will and going concern value might be impaired or destroyed. In this state of affairs it was inevitable that a demand for reform arose." pp. 1-2.

Thus, the charging order came into being as a part of the English Partnership Act of 1890. The English statute was the model for section 28 of the Uniform Partnership Act, which is quite comparable to the original English version. Although the uniform act has been adopted in nearly all jurisdictions, there are few cases and very little authority on the actual procedure to be followed in enforcing a charging order. See Unif. Partnership Act § 28, 6 U.L.A. 358 (1969 and 1987 Supp.). K.S.A. 56-328 sets forth no specific procedure to be followed in enforcing a charging order and the procedure contemplated is described only in broad, general language. Professor Gose, in discussing the lack of a specific procedure, postulates:

"Actually the statute apparently contemplates a highly flexible and elastic procedure under which the court may employ a charging order, a receivership of the debtor partner's interest, a sale of that interest, and a wide range of orders for accounting or for other purposes 'which the circumstances of the case may require.' Fundamentally, the act seems to proceed on the theory that the primary method for satisfying the creditor's judgment shall be by means of an order diverting the debtor partner's share of the profits to his creditor in a manner somewhat like that used in garnishment proceedings. If this method is ineffectual there is another more drastic course of action mentioned—a sale of the debtor's interest in the partnership. The other things provided—for appointment of a receiver and the taking of accounts and the making of such orders as the 'circumstances of the case may require'—appear to be designed simply as aids to these 'two basic methods of collecting. The use of these subsidiary aids to the collecting process certainly should be regarded as permissive rather than compulsory. There is no apparent necessity for the appointment of a receiver, if effective collection would result from the mere issuance of an order requiring the partners to pay directly to the creditor the amounts which otherwise would go to the debtor partner. The receiver in such a case would serve no useful function but would merely add to the expense and complexity of the proceeding.

"This broader concept of interpretation appears quite definitely to have been the view of Professor William Draper Lewis, the principal architect of the Uniform Act. Orginally the drafting of the Act was assigned to Dean Ames of the Harvard Law School. He died before the task was completed and Professor Lewis of the University of Pennsylvania Law School then took over and completed the job. In a general survey of the Uniform Act, written in the year following its approval by the Conference of Commissioners on Uniform State Laws, he explained the charging order procedure as follows:

'After the adoption of the Act, when a judgment is secured against a partner by his separate creditor, all that a creditor will have to do is to apply to the court which gave him the judgment, or any other court, to issue an order on the other partners to pay him the profits which would otherwise be paid to his debtor, or to make any further order which will result in his securing the payment of his judgment without unduly interfering with the rights of the remaining partners in partnership property.'

"Although this brief statement is of a most general character, it accords with the apparent meaning and intent of the statutory language." pp. 10-11.

The procedure advocated by Professor Gose would appear to be consistent with the broad language of K.S.A. 56-328 and the intent of the drafters of the uniform act. The charging order in the present case provided in part:

"IT IS HEREBY ORDERED that the Plaintiffs . . . are granted a charging order . . . in and to any interest which A. Scott Anderson [and] E. Sylvia Anderson . . . have in and to any of the following partnership properties:

. . . .

(b) Land Opportunities Co.;

. . . .

IT IS FURTHER ORDERED that each of the above partnerships are directed and ordered to charge any interest of the Defendants with payment of the judgment . . . ."

The charging order then directed each partnership to provide an accounting and full information relative to the Andersons' interests in the various partnerships, including Land Opportunities Co.

Based upon the procedure outlined by Professor Gose, upon service of the charging order on Land Opportunities Co. the partnership was required to make all further distributions either directly to the judgment creditors or, if the disbursing partners had any question as to such distribution, they could have paid the money into court or sought additional instructions from the court. K.S.A. 56-328(a) states that the court may make "all other

orders, directions, accounts and inquiries . . . which the circumstances of the case may require." We interpret this language to mean that upon application of any of the parties, the partnership, or any other interested person or entity, the court has the power to issue such orders as are necessary to enforce its charging order. While the institution of actual garnishment proceedings would not ordinarily be required to enforce a charging order as to funds in the hands of the partnership, here the appellees sought collection of their judgment and enforcement of the charging order by garnishment proceedings against the Goode option funds which were in the possession of Mid-America. If the garnishment had not been served upon Mid-America, the funds would have been payable to Land Opportunities Co. and the Andersons' share, as profits, would be subject to the charging order. Under such circumstances, the funds held by Mid-America were subject to the charging order to the same extent as they would have been if paid to the partnership. Garnishment of Mid-America was merely one way of enforcing the charging order.

Here, the issues before the court are limited to the effect of the charging order upon the Andersons' distributive share of the proceeds. We are not called upon to determine the proper procedure to actually sell a partnership interest, which appears to be contemplated by K.S.A. 56-328(b). In a case where a judgment creditor is seeking the foreclosure and sale of an entire partnership interest as opposed to collecting only a partner's distributive share of the profits, if any, the procedure contemplated by the statute is apparently more extensive. See generally 59A Am. Jur. 2d, Partnership § 790 *et seq.* However, we hold that the issuance and service of a proper charging order is sufficient to require the partnership to pay the judgment debtor's share of distributable partnership profits to the judgment creditor or to the court to await further orders of the court. Of course, it should be apparent that the extent of any such payment is limited to any amounts due on the unsatisfied judgment. The procedure herein set forth, while similar to garnishment, is separate and apart from the garnishment statutes and is controlled by K.S.A. 56-328 and the broad powers of the court thereunder.

Finally, we must determine whether the service of the charg-

ing order upon the partnership creates a lien, claim, or charge upon the judgment debtors' distributive share of partnership profits that has priority over and is superior to an unperfected security interest in the same property. While we have found no cases which specifically state that service of a charging order creates a lien as of the date of service, many cases seem to assume that it does. Compare *Shirk v. Caterbone*, 201 Pa. Super. 544, 193 A.2d 664 (1963); *Taylor v. S & M Lamp Co.*, 190 Cal. App. 2d 700, 12 Cal. Rptr. 323 (1961); *Scott v. Platt*, 177 Or. 515, 163 P.2d 293 (1945).

K.S.A. 1987 Supp. 84-9-301(3) defines the term "lien creditor":

"A 'lien creditor' means *a creditor who has acquired a lien on the property involved by attachment, levy or the like* and includes an assignee for benefit of creditors from the time of assignment and a trustee in bankruptcy from the date of the filing of the petition or a receiver in equity from the time of appointment." (Emphasis added.)

K.S.A. 1987 Supp. 84-9-301(1)(b) subordinates an unperfected security interest to the rights of "a person who becomes a lien creditor before the security interest is perfected." If the appellees became "lien creditors" by any means before appellant perfected its security interest on July 31, 1986, then appellant's security interest is subordinate to the rights of appellees. Conversely, if appellees did not become lien creditors prior to July 31, 1986, their interest in the funds is subordinate to the appellant's prior security interest.

The Official UCC Comment further explains subsection (1)(b):

"3. Paragraph (1)(b) provides that an unperfected security interest is subordinate to the right of lien creditors. The section rejects the rule applied in many jurisdictions in pre-Code law that an unperfected security interest is subordinated to all creditors, but requires *the lien obtained by legal proceedings to attach to the collateral* before the security interest is perfected. The section subordinates the unperfected security interest but does not subordinate the secured debt to the lien."

We conclude that a proper interpretation of K.S.A. 56-328 is that a valid charging order does create a lien upon the debtor partner's distributive share of present and future profits as of the time of service upon the partnership. The lien or charge thus established has priority over other security interests which are not perfected prior to the date of service of the charging order.

The claim of Arkansas City and Southwest National to the funds in this case is superior to the security interest of Hesston.

The judgment is affirmed.