PRINTED MEDIA SERVICES, Plaintiff,

v.

SOLNA WEB, INC., Defendant,

Solna Web, U.S.A., Garnishee,

Evello Investments, N.V., Intervenor.

No. 93–2454–JWL.

United States District Court,
D. Kansas.

Nov. 12, 1993.

Truman K. Eldridge, Jr., Renana B. Abrams, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, Thomas L. Hamlin, John C. Knoepfler, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for plaintiff.

Mark S. Gunnison, McDowell, Rice & Smith, P.C., Overland Park, KS, Harry E. Wigner, Jr., W. Joseph Hatley, Lathrop & Norquist, Overland Park, KS, for defendant.

Edward M. Boyle, Payne & Jones, Chtd., Overland Park, KS, for intervenor.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

### I. Introduction

In this action, plaintiff Printed Media Services ("Printed Media") seeks to enforce a valid default judgment against Solna Web, Inc. pursuant to K.S.A. §§ 60–714 et seq. On May 27, 1992, Printed Media obtained a $6,688,339 judgment against Solna Web, Inc. in the United States District Court for the District of Minnesota. In an effort to satisfy this judgment, Printed Media requests that the court set aside a transfer, which took place in December of 1991, whereby Solna Web, Inc. transferred all of its assets to its parent corporation, Evello Investments N.V. Printed Media alleges that this transfer was fraudulent, in violation of K.S.A. § 33–102, and, thus, is void and has no effect.

A trial to the court was held in this matter on the 26th and 27th of October, 1993. After considering at great length the evidence in this case, the court finds that the plaintiff has not met its burden to show that the transfer was fraudulent. Accordingly, Printed Media's request for relief is denied and the court will not set aside the transfer. Furthermore, the court finds that even if the purpose of the transfer had been to avoid payment to Printed Media, Printed Media could not have reached the assets of Solna Web, Inc., which are in question here because the assets were already subject to a valid perfected security interest, and relief is denied on this ground as well.

Pursuant to F.R.C.P. 52(a), the court makes the following findings of fact and conclusions of law.

### II. Findings of Fact

1. In 1986, Printed Media bought a web offset press from Solna, Inc., a Missouri corporation that distributed, in the United States, sheetfed and webfed presses manufactured by the Swedish corporations owned by AB Bonnierforetagen, a Swedish conglomerate ("the Bonnier Group"). At that time, the stock of Solna, Inc., was wholly owned by the Bonnier Group.

2. In early 1989, Solna, Inc., stopped distributing sheetfed presses and their component parts, but continued to distribute web fed presses and parts. In 1990, the Bonnier Group stopped manufacturing sheetfed presses.

3. In response to the change in the type of presses distributed, Solna, Inc., changed its name to Solna Web, Inc. ("Solna Web (MO)"), but continued to distribute presses manufactured by the Bonnier Group.

4. In December of 1989, PEC Acquisition Corporation ("PEC Acq."), a Delaware corporation, acquired certain assets and assumed certain liabilities of Solna Web, Inc.,

the Missouri corporation ("Solna Web (MO)").

5. PEC Acq. was a wholly owned subsidiary of Publishers Equipment Corporation ("PEC"), formed by PEC specifically for the purpose of acquiring the assets and liabilities of Solna Web (MO). PEC is a publicly held Texas corporation, of which the Bonnier Group owned, at the time relevant to this lawsuit, a significant minority portion of the stock.

6. The sale was finalized on January 12, 1990 by the execution of an Asset Purchase Agreement. No party in this lawsuit contests the validity of the sale of the assets of Solna Web (MO) to PEC Acquisition Corp. All parties agree this was a valid transfer and no fraud is alleged as to it.

7. As part of the asset purchase agreement between PEC Acq. and Solna Web (MO) ("PEC Acq. asset purchase agreement"), Solna Web (MO) sold the right to use the trade name "Solna Web" and agreed that it would change its name to something not similar to Solna Web, Inc. Subsequent to the execution of the agreement, on May 3, 1990, PEC Acq. changed its name to Solna Web, Inc. ("Solna Web (DE)").

8. PEC Acq. acquired the assets of Solna Web (MO) for a purchase price of $2,462,756. The purchase price was paid by PEC Acq. in the form of a ten year non-interest bearing note ("Note") executed by PEC Acq. in favor of Solna Web (MO).

9. PEC Acq. granted Solna Web (MO) a security interest in the assets transferred in order to secure or collateralize the Note.

10. After this asset transfer, Solna Web (MO) changed its name to Bocca, Inc. ("Bocca"), as was required by the agreement. Bocca's assets consisted of about $930,572 cash and the Note for $2,462,000, which were available for any debts owed to creditors.

11. PEC Acq. became Solna Web (DE) and continued to do the same business that was done by Solna Web (MO). Operations were conducted from the same facility in Kansas City, Missouri, and many of the same employees worked for both corporations.

12. The parties vehemently disagree as to what extent, if any, PEC Acq. (later Solna Web (DE)) assumed liability on the press sold to Printed Media by virtue of the asset purchase agreement with Solna Web (MO) (later Bocca).[1]

13. On May 15, 1990, Printed Media filed suit in federal court in Minnesota naming Solna Web, Inc. as defendant, alleging claims based on the failure of the press, purchased in 1986, to function properly. Initially, the complaint described Solna Web, Inc. as a Missouri corporation, even though at the time, all the assets of Solna Web (MO) had been sold to PEC Acq. The complaint was not amended until January of 1992 to reflect that Solna Web (DE) was being sued.

14. In June of 1991, PEC placed into bankruptcy, in Sweden, its Swedish webfed press manufacturing company. Roland Anger and a partner, through entities controlled by them, purchased the assets of this bankrupt company from the bankruptcy trustee in Sweden.

15. As part of this transaction, the Bonnier Group agreed to assign the Note and security agreement to a corporation named Evello AB. Evello AB had been a dormant corporation for four or five years, but owned shares of stock in other corporations. Evello AB was wholly owned by Roland Anger.

16. Anger and a partner reorganized the webfed press printing manufacturing operation it had just acquired through the bankruptcy proceedings and named it Solna Web International AB ("Solna Web Int'l").

17. The court finds that Bocca, after the assignment of the Note, had over $900,000 with which to pay its remaining debts and any judgment that Printed Media might eventually have had against it.

---

1. Whether PEC Acq. (Solna Web (DE)) assumed liability on the press sold to Printed Media is not an issue in this lawsuit. The issue of liability was resolved by the United States District Court for the District of Minnesota by the entry of a default judgment in favor of Printed Media Services, Inc., which this court has held is entitled to full faith and credit. *See* Memorandum and Order of January 25, 1993. This lawsuit is solely concerned with disputes surrounding the enforcement of the default judgment.

18. In June of 1991, Solna Web (DE) was the distributor of presses of a Swedish manufacturer that was out of production. Although it continued to cost money to run the corporation, the corporation was not generating revenue. Solna Web (DE) did not generate a profit in 1990, nor in the first half of 1991.

19. In July of 1991, Herb Minnis, the manager of special projects at Solna Web (DE) (he also held the same position with Solna Web (MO)), met with Anger in Sweden to discuss the possibility that Minnis and Ulf Aggeryd would buy the Solna Web (DE) distributorship. The lawsuit taking place in Minnesota was not discussed.

20. On August 30, 1991, Evello Investments, N.V. ("Evello NV"), bought 100% of the stock of Solna Web (DE) from PEC. Roland Anger owned sixty of one-hundred thirty shares of stock in Evello NV and had the power to sign on behalf of the corporation. This stock purchase ("Evello NV stock purchase") was evidenced by an agreement between PEC, Solna Web (DE) and Evello NV.

21. At the time of the Evello NV stock purchase, Solna Web (DE) still owed on the Note. This debt was reflected in the balance sheet of Solna Web (DE) dated August, 1991, in the amount of $1,055.338, and was later reflected in the October, 1991, balance sheet in the amount of $1,114,791.

22. Immediately upon Evello NV's acquisition of the stock of Solna Web (DE), Anger directed the officers of Solna Web (DE) to locate an entity to take over the business of distributing webfed press products manufactured in Sweden.

23. A distributor agreement was executed between Inland Industries, Inc. ("Inland"), and Solna Web Int'l which provided that as of January 1, 1992, Inland, or a designated wholly owned subsidiary, would be the exclusive distributor of Solna products and services in the United States. Inland formed Solna Web USA, Inc. ("Solna Web USA"), to serve as distributor under the agreement.

24. As part of the distributorship agreement, Evello NV and Solna Web (DE) entered into a letter of intent with Inland which provided that Evello NV and Solna Web (DE) would deliver on consignment to Solna Web USA all inventory of Solna Web (DE) located in Joplin, Missouri.

25. After a distributor was found, and while Printed Media's lawsuit was pending in Minnesota, Evello NV, which owned all the stock in Solna Web (DE), by and through Anger, began a series of actions which would ultimately result in Evello NV's acquisition of the assets of Solna Web (DE). Anger directed the employees of Solna Web (DE) to engage in an evaluation of the corporation's assets so that Evello NV could purchase these assets by the end of the year, December 31, 1991.

26. Herb Minnis prepared the evaluation and retained legal counsel to prepare appropriate legal documents so that Evello NV could purchase the assets of its subsidiary, Solna Web (DE).

27. On December 31, 1991, Solna Web (DE) transferred its assets to Evello NV, its parent company and sole shareholder ("Evello NV asset purchase agreement"). The agreement was signed on behalf of Solna Web (DE) by Ulf Aggeryd, the corporation's vice president. Pursuant to a written power of attorney, Herb Minnis signed on behalf of Anger and Evello NV. Thus, the actual owner of the assets of the now defunct Solna Web (DE) was Evello NV, but the inventory at issue in this case was in the possession of Solna Web USA.

28. As part of the Evello NV asset purchase agreement, Evello NV agreed to assume certain liabilities of Solna Web (DE): the Note to Bocca in the amount of $1,257,299; (2) warranties to customers in the amount of $405,243.04; and (3) debt to PEC in the amount of $37,610.78. At the time of the agreement, the Note had already been assigned to Evello AB from the Bonnier Group at the direction of Anger.

29. On January 27, 1992, Magistrate Judge Jonathan Lebedoff of the United States District Court for the District of Minnesota, ruled that Solna Web (DE) had been sued and adequately served with process and was thus a party defendant in the action that had been filed in May of 1990.

The magistrate allowed Printed Media to amend its lawsuit to add Bocca and to serve process on it.

30. On May 27, 1992, United States District Judge Diana Murphy, of the District of Minnesota, entered a default judgment in excess of $6,000,000 in favor of Printed Media and against Solna Web, Inc. (DE). Printed Media then registered its judgment in this district, and this proceeding commenced.

31. The court finds that following the Evello NV asset purchase agreement of December 1991, Solna Web (DE) had enough assets with which to pay the debts Anger owed at the time.

32. The court finds that the transfer of assets of Solna Web (DE) to Evello NV was not fraudulent and was not done in an effort to avoid payment to creditors or payment to Printed Media.

33. The court finds that even if the transfer had been designed to avoid payment to Printed Media, plaintiff could not have realized on its judgment against Solna Web (DE), because Solna Web (DE)'s assets in question were subject to a prior valid perfected security interest in favor of Evello AB. Thus, plaintiff could not have suffered any damages as a result of the alleged fraud.

*III. Conclusions of Law*

1. In Kansas every transfer of property made with the intent to defraud creditors is deemed utterly void and of no effect. K.S.A. § 33–102. K.S.A. 33–102 provides:

> "Every gift, grant or conveyance of lands, tenements, hereditaments, rents, goods or chattels, and every bond, judgment or execution, made or obtained with intent to hinder, delay or defraud creditors of their just and lawful debts or damages, or to defraud or to deceive the person or persons who shall purchase such lands, tenements, hereditaments, rents, goods or chattels, shall be deemed utterly void and of no effect."

■ 2. In order to recover on a claim of a fraudulent transfer, Printed Media must show, first, an intent on the part of the transferor to hinder, delay or defraud its creditors, and, second, the participation of the transferee in the fraudulent scheme or knowledge on the transferee's part of facts and circumstances which would import knowledge of the fraud to the transferee. *Koch Engineering Co. v. Faulconer*, 239 Kan. 101, 716 P.2d 180, 183 (1986); *Credit Union of America v. Myers*, 234 Kan. 773, 676 P.2d 99, 104–5 (1984).

■ 3. Because direct proof of fraud can seldom be obtained, a fraudulent purpose may be shown by the conduct and appearance of the parties, the details of the transactions, and the surrounding circumstances. *Credit Union of America*, 234 Kan. 773, 676 P.2d at 104.

■ 4. Whether a transfer is or is not fraudulent as to creditors is a question of fact. *Houska v. Lake*, 148 Kan. 229, 80 P.2d 1102 (1938); *Bank of Inman v. Graves*, 148 Kan. 468, 83 P.2d 666 (1938). A conveyance can only be set aside by clear and convincing evidence of fraud. *Hustead v. Bendix Corp.*, 233 Kan. 870, 666 P.2d 1175 (1983); *Nordstrom v. Miller*, 227 Kan. 59, 65, 605 P.2d 545 (1980). The trier of fact has the responsibility of determining what testimony should be believed and what weight should be given the testimony. *Credit Union of America*, 234 Kan. 773, 676 P.2d at 10.

■ 5. The Kansas Supreme Court has recognized six so-called "badges" of fraud as analytical tools to aid the court in determining whether a transfer should be set aside. These possible indicia of fraud are: (1) a relationship between the transferor and transferee; (2) the transferee's knowledge of litigation against the transferor; (3) insolvency of the transferor; (4) a belief on the transferee's part that the contract was the transferor's last asset subject to a Kansas execution; (5) inadequacy of consideration; and (6) consummation of the transaction contrary to normal business procedures. *City of Arkansas City v. Anderson*, 243 Kan. 627, 762 P.2d 183 (1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989).

■ 6. The court must look to all of the circumstances surrounding the transfer, for the six badges are not meant to be exhaus-

tive, nor is the presence of one or more indicia determinative of fraud. The "[e]xistence of a circumstance which might be considered a badge of fraud, or existence of several such circumstances, is not necessarily incompatible with good faith in fact." *Johnson v. Collins*, 142 Kan. 52, 54, 45 P.2d 575 (1935).

■ 7. Printed Media has shown that a relationship existed between the transferor and the transferee, the first badge of fraud. At the time of the December 31, 1991 agreement (Evello NV asset purchase agreement), Evello NV was the sole shareholder of Solna Web (DE). Anger had the power to sign on behalf of Evello NV and owned sixty of one-hundred and thirty shares of the corporation. Anger also held the note and security agreement that had been assigned by the Bonnier Group, so he was also a creditor of Solna Web (DE). The fact that the parties to a transfer of property are related, however, does not automatically warrant a conclusion that the transaction was fraudulent as to creditors. Rather, it subjects the transfer to stricter scrutiny by the finder of fact. *See Credit Union of America*, 234 Kan. 773, 676 P.2d at 105. Strict scrutiny is applied to this transfer, for it involves a corporation and its wholly owned subsidiary *See City of Arkansas City*, 243 Kan. 627, 762 P.2d at 189.

■ 8. The second and third badges of fraud, transferee's knowledge of litigation against the transferor and insolvency of the transferor, are closely related under the circumstances of this case. The transfer of property by a debtor in anticipation of a suit against the debtor, or while a suit is pending against it is commonly recognized as an indication of fraud, particularly when the transfer renders the debtor insolvent or greatly

reduces its assets. *Credit Union of America*, 234 Kan. 773, 676 P.2d at 105. The transfer of assets from Solna Web (DE) to Evello NV was finalized in December of 1990. A lawsuit involving a corporation that used the name Solna Web, Inc. had been pending in Minnesota as of May of 1990. Anger was aware of this lawsuit. All of the assets of Solna Web (DE) were transferred to Evello NV, so Solna Web (DE) was rendered insolvent by the transfer in the sense that it could not pay a judgment that might result from the lawsuit.

9. Although the court finds that Anger had knowledge of the suit in Minnesota, the extent of his knowledge remains unclear. At the time of the transfer, only one corporation, Solna Web, Inc., was sued by Printed Media. Exactly which corporation was named in the complaint, Solna Web (MO) or Solna Web (DE), was not definitively determined until late January of 1992, even though Printed Media was aware, as early as May of 1991, that two separate corporations had used the name Solna Web, Inc. Second, Solna Web (DE) and Evello NV have repeatedly and consistently denied liability on the press sold to Printed Media approximately five years before the transfer. In those five years, the assets at issue here belonged to three different companies: Solna Web (MO) (later Bocca), PEC Acq., and Solna Web (DE). Potential liability on the press was contingent on many factors. Thus, when Anger ordered the transfer of assets, it was hardly a matter of certainty that Solna Web (DE) would be deemed liable on the press.[2] Knowledge of a debt owed and knowledge of the possibility of defending a lawsuit do not bear equally on the issue of fraudulent intent.[3]

2. Printed Media argues that this case is similar to *City of Arkansas City v. Anderson*, 243 Kan. 627, 762 P.2d 183 (1988), in which the court deemed a transfer fraudulent when made in anticipation of litigation. The court is not persuaded *City of Arkansas City* requires a finding of fraud in this case. Here, unlike the facts of *City of Arkansas City*, a judgment against the grantor had neither been rendered nor was one "imminent." *See id.* at 191. Preparation for the transfer actually began in the summer of 1991, yet Printed Media did not receive a judgment until the spring of 1992. There has been no evidence presented by the plaintiff from which this court

concludes that either Minnis or Anger believed that Solna Web (DE) would ultimately be adjudged liable, let alone, for over $6,000,000 worth of damages.

3. While plaintiff has continually tried to equate the identity of Solna Web (DE) with that of Solna Web (MO), the court finds that they are separate corporations with separate assets and that claims could be maintained against them individually. This is evidenced by the fact that when plaintiff amended its original complaint in the Minnesota litigation, it did not simply amend it to switch

Moreover, the court finds credible the testimony of both Minnis and Anger that, at the time of the Evello NV asset purchase agreement, they were under the impression that Printed Media was intending to sue the corporation that originally sold it the press, Solna Web (MO) or Bocca. Badges of fraud are subject to explanation and contradiction by oral testimony, for they are merely "suspicious circumstances." *See Turon State Bank v. Estate of Frampton,* 17 Kan.App.2d 829, 845 P.2d 79, 82 (1993) (citing *Schreiber Milling Co. v. Nutrena Mills, Inc.,* 149 Kan. 276, 282, 87 P.2d 577 (1939); *Mohr v. State Bank of Stanley,* 244 Kan. 555, 569, 770 P.2d 466 (1989)). The court is simply not persuaded that any knowledge Anger may have had as to the litigation pending in Minnesota motivated the transfer of assets he directed in December of 1991.

10. If one disregards the perfected security interest encumbering the inventory in question,[4] Printed Media has shown that Solna Web (DE) knew that the assets transferred were the last assets that might be subject to Kansas execution. However, the litigation giving rise to potential liability was not in Kansas, there were other assets available in Missouri, and whether any assets would ultimately be levied upon was contingent on many factors.

11. Next, and quite significantly, the court finds that there was valid consideration and that, under the circumstances of this case, this is strong evidence of a lack of fraudulent intent. *See Wallace, Saunders, Austin, Brown & Enochs v. Louisberg Grain Company,* 250 Kan. 54, 61, 824 P.2d 933, 939 (1992) (court found no *prima facie* case of fraud was established where there was valid consideration even though other five badges of fraud were present). Whether consideration is valid depends upon whether "something of value [was] bargained for and given in exchange for a promise." *See* P.I.K. 2d

18.03; E. Allen Farnsworth, Contracts § 2.2 (2d ed. 1990). An agreement to assume a debt may constitute valid consideration. *See Wilson v. Evans,* 185 Kan. 520, 345 P.2d 1002 (1959) ("An instrument, based upon a business transaction, wherein A states, 'I owe B $1,300,' contains an implied valid and legally sufficient consideration and promise to pay....").

In exchange for the assets transferred by Solna Web (DE), Evello NV assumed preexisting debt and warranty liability in the amount of $1,700,152.82. Part of this debt was the debt originally owed to Bocca represented by the Note in the amount of $1,257,-299. After a series of complicated transactions, involving Bocca and the Bonnier Group, the Note was assigned to Anger and Evello AB. Thus, Anger held the Note at the time of the transfer of assets.

The court finds that the assignment of the Note and security agreement from the Bonnier Group to Evello AB was valid, and that sufficient consideration was given for its acquisition. The only evidence that Printed Media has offered to call into question the validity of this assignment is Anger's own testimony that he was an employee for the Bonnier Group for many years. Because the court finds that the transaction which resulted in the assignment of the Note to Evello AB was in good faith and for valid consideration, the only effect of the assignment was to change the identity of the creditor. The assignment did not discharge the debt owed by Solna Web (DE) in any way. Thus, Evello NV assumed a valid preexisting debt of Solna Web (DE).

Evidence at trial indicated that the amount of assumed liability (including the Note) equalled or exceeded the value of the assets transferred. Thus, the court finds Evello NV gave valid consideration for the assets of Solna Web (DE).

---

Solna Web (MO) to Solna Web (DE), rather it amended the complaint to change Solna Web (MO) to Solna Web (DE) *and* to add a count against Bocca. Plaintiff has also received a settlement from Bocca which in no way impedes its rights against Solna Web (DE). The state of the lawsuit, and the existence of two separate corporate accounts from which Printed Media might recover, corroborate Anger's testimony that he

believed Printed Media intended to sue Bocca, and support the inference that any possible liability on the press did not motivate the transfer of assets from Solna Web (DE) to Evello NV.

4. Which the court does not, as discussed in paragraph 16.

12. Finally, the court finds that the execution of the Evello NV asset purchase agreement was not contrary to normal business procedures. It was not a secret or hurried transaction, but rather took place over the course of several months and was designed to be completed by the end of the calendar year. Legal counsel was hired to document the transaction and prepare and execute appropriate legal papers. Furthermore, there were significant business justifications for finding a new distributor for the products of the Solna Group in the United States, and once a distributorship, Inland's subsidiary, Solna USA, was found there was no need to maintain the existence of a non-profitable corporation.

13. "The real underlying question in this case concerns the bonafides of the transaction...." *See Polk v. Polk,* 210 Kan. 107, 499 P.2d 1142, 1145 (1972). After consideration of all of the circumstances surrounding the Evello NV asset purchase agreement, the court finds that Solna Web (DE) did not intend to hinder or delay the payment of debt owed to Printed Media, but rather the corporation simply preferred one creditor over another *potential* creditor. The law in Kansas is clear that:

> A debtor may in good faith prefer one creditor to another and the diligent creditor is entitled to protection if he is in good faith protecting his own claim as against others. The mere fact that an insolvent debtor pays one creditor in full, and in doing so absorbs all of his assets, is not of itself evidence of an intention to hinder, delay or defraud other creditors....

> Under the established law of this state a debtor has a right to prefer creditors, and in doing so may pay or secure one of his creditors so long as such performance is in payment of a bona fide preexisting indebtedness.

*Mohr v. State Bank of Stanley,* 244 Kan. 555, 770 P.2d 466, 478–79 (1989) (citing *Jayhawk Equipment Co. v. Mentzer,* 193 Kan. 505, 509, 394 P.2d 37 (1964) and *Schmitz v. Stockman,* 151 Kan. 891, 893, 101 P.2d 962 (1940)). On December 31, 1991, the Note was a valid existing debt, fully secured by a previously perfected security interest in certain assets.

Evello AB, in essence Anger, was entitled to protection, for he in good faith protected his own claim as against others. The effect of the transfer was to discharge the preexisting obligation of Solna Web (DE), as represented by the Note, in exchange for a transfer of assets whose value was less than the total liability assumed.

14. Although some indicia of possible fraud are present, the court must weigh all the evidence as a whole, and in doing so may attach greater significance to some badges of fraud over others. *See Mohr v. State Bank of Stanley,* 244 Kan. 555, 770 P.2d 466, 477 (1989) (citing, *Koch Engineering Co. v. Faulconer,* 239 Kan. at 107, 716 P.2d 180). A "suspicious" transaction is not enough. *See Polk v. Polk,* 210 Kan. 107, 499 P.2d 1142 (1972) (finding of no fraudulent conveyance upheld even though record indicated all six badges of fraud were present). "[W]hile certain circumstances may give rise to an inference of fraud, the law never presumes it, and ... any person who alleges that acts have been committed in bad faith and for a fraudulent purpose takes upon himself the burden of proving his allegations." *See id.* 499 P.2d at 1145 (citing *Baughman, Sheriff v. Penn,* 33 Kan. 504, 6 P. 890 (1885)). Plaintiff has the burden to prove by clear and convincing evidence that there was fraud. *Nordstrom v. Miller,* 227 Kan. 59, 65, 605 P.2d 545 (1980).

15. Plaintiff has not met its burden to show that there was an intent on the part of Solna Web (DE) to hinder, delay or defraud its creditors or that there was knowledge on the part of Evello NV of facts and circumstances of fraud.

16. In addition, the court is not persuaded that Printed Media could have realized on any judgment from the assets in question even if the transfer were fraudulent, for the property transferred was already subject to a prior lien, the prior perfected security interest. *See Gorham State Bank v. Sellens,* 244 Kan. 688, 772 P.2d 793, 796 (1989) (citing with approval *Flaks v. De Berry,* 53 Wyo. 203, 79 P.2d 825 (1938)) ("The right of the creditor to disregard the conveyance and attach the property presupposes that the title for the purpose of enabling the

creditor to enforce his claim remains in the fraudulent grantor.").

When PEC Acq. bought the assets of Solna Web (MO) (later Bocca), it paid in the form of a ten year non-interest bearing note. To collateralize the Note, PEC Acq. granted Bocca a security interest in the assets transferred which was later perfected by the filing of financing statements with the Jackson County Department of Records and the Missouri Secretary of State. Thus, the assets of Solna Web (DE) were subject to a perfected security interest well before Printed Media obtained the judgment against Solna Web (DE) and the subsequent lien on the assets. A perfected secured creditor has priority over a judgment lien creditor; the lien creditor takes subject to the prior perfected security interest. K.S.A. § 84–9–301 (Supp. 1991); *City of Arkansas City v. Anderson*, 242 Kan. 875, 752 P.2d 673, 684 (1988); *see also* James J. White & Robert S. Summers, Uniform Commercial Code § 26–2 (3d ed. 1988).

Solna Web (DE) did not transfer property that could have been reached by execution for the payment of a debt owed to Printed Media. Printed Media was not prejudiced by the transfer. *See Bradley v. Larkin*, 5 Kan. App. 11, 47 P. 315 (Kan.1896) (a creditor cannot attack the validity of a transfer unless it is made to appear that the rights of the creditor are prejudiced by reason thereof); *see also Hicks v. Sovran Bank*, 812 S.W.2d 296, 302 (Tenn.App.1991); *Holthaus v. Parsons*, 238 Neb. 223, 469 N.W.2d 536, 538 (1991); *Davis v. Nielson*, 9 Wash.App. 864, 515 P.2d 995, 1000 (1973).

*IV. Conclusion*

Printed Media has not persuaded the court by clear and convincing evidence that the transfer of assets from Solna Web, Inc. to Evello Investments N.V. was fraudulent. Nor has Printed Media convinced the court by a preponderance of the evidence that, even if the court set aside the transfer, it could have reached the assets of Solna Web, Inc. in question, because they were subject to a valid, previously perfected security interest.

IT IS THEREFORE ORDERED BY THE COURT that the plaintiff's claim for relief is denied, and the clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**