**THOMAS WELL SERVICE, INC., Walter J. Trowbridge, Sandra S. Trowbridge, Jerry W. Jantz, Martha J. Jantz, Lonnie Sedgwick, Melvin W. Rollins, and Paula L. Rollins, Plaintiffs,**

v.

**WILLIAMS NATURAL GAS COMPANY, Defendant.**

No. 93–4090–SAC.

United States District Court, D. Kansas.

Nov. 8, 1994.

476

Mark A. Buck, Michael J. Unrein, Christopher M. Rohrer, Davis, Unrein, Hummer, McCallister & Buck, Topeka, KS, for plaintiffs.

Donald W. Bostwick, Teresa J. James, Adams, Jones, Robinson & Malone, Wichita, KS, Paul A. Karns, Williams Natural Gas Co., Tulsa, OK, Williams Natural Gas Co., for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

In this declaratory judgment action, the parties essentially seek a determination concerning their respective rights in certain oil and gas properties in Jefferson County, Kansas. On March 9, 1994, Thomas Well Service, Inc. (TWS), commenced this action in Jefferson County District Court seeking, *inter alia,* a declaratory judgment that (1) certain oil and gas leases executed by the landowners in 1948 and 1949 and now owned by Williams Natural Gas Company (WNG) are no longer valid, and (2) certain oil and gas leases executed by the current landowners in 1992 and 1993 to TWS are valid.

On April 14, 1993, WNG filed a notice of removal to this court. Federal jurisdiction is based upon diversity. WNG filed a counterclaim seeking a declaratory judgment that (1) the oil and gas leases executed in 1948 and 1949 which it now possesses are valid, and (2) that the oil and gas leases executed in 1992 and 1993 held by TWS are on "topleases." [1]

1. A toplease is defined as a "lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated." Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* at 1285 (8th ed. 1991);

On September 8, 1993, this court entered an eight page memorandum and order denying TWS' motion to remand. On May 16, 1994, the magistrate judge granted the motion to intervene and to be joined as plaintiffs filed by Walter J. Trowbridge, Sandra S. Trowbridge, Jerry W. Jantz, Martha J. Jantz, Lonnie Sedgwick, Milton W. Rollins and Paula L. Rollins. *See* (Dk. 53). These persons are the successors in title to the persons who executed the leases in 1948 and 1949. These are also the same persons who entered the oil and gas leases with TWS in 1992 and 1993. All of the plaintiffs are essentially aligned against WNG.

This case comes before the court upon WNG's motion for summary judgment (Dk. 55),[2] the plaintiffs'[3] motion for summary judgment (Dk. 57), the plaintiffs' motion to supplement memorandum in support of motion for summary judgment (Dk. 68), and WNG's motion to strike portions of plaintiffs' affidavits (Dk. 64).

The court, having considered the briefs of counsel and the applicable law, is now prepared to rule.[4]

### Standards for Summary Judgment

■ A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ...

preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

■ The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell*, 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

■ If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir.1991); *see Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-

---

*see Frankfort Oil Co. v. Snakard*, 279 F.2d 436, 445 n. 23 (10th Cir.) ("In the oil and gas vernacular to toplease is to secure a lease on land covered by an existing lease to the end that the toplease will be effective after the expiration of the existing lease and the interest of one or more lessees thereby eliminated."), *cert. denied*, 364 U.S. 920, 81 S.Ct. 283, 5 L.Ed.2d 259 (1960).

2. On October 28, 1994, the court entered an order denying WNG's motion for summary judgment without prejudice. This was done to afford the court an opportunity to consider and dispose of all the pending motions in this case in a single order. The court *sua sponte* sets aside its order of October 28, 1994, and considers WNG's motion on the merits.

3. The interests of all of the plaintiffs, including the plaintiffs/intervenors, are similarly aligned for purposes of this case. For simplicity, unless otherwise specifically noted, the court will refer to all of the plaintiffs as "plaintiffs." In addition, the court refers to Walter J. Trowbridge, Sandra S. Trowbridge, Jerry W. Jantz, Martha J. Jantz, Lonnie Sedgwick, Melvin W. Rollins, and Paula L. Rollins, collectively as the "individual plaintiffs."

4. The plaintiffs' request for oral argument is denied. The court concludes that oral argument would not materially assist it in deciding the pending motions. *See* D.Kan.Rule 206(d).

moving party's case."). When the nonmoving party will have the burden of proof at trial, " 'Rule 56(e) ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun*, 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); *see Martin*, 3 F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings); *see also Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.*, 849 F.2d at 1273.

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

### Overview of the Dispute

A brief overview of the respective arguments of the parties will provide a better understanding of this case. In 1948 and 1949, W.G. Rule entered into certain oil and gas leases with persons owning land in the McLouth Gas Storage Field. At approximately the same time that W.G. Rule entered those oil and gas leases, Cities Service Gas Company entered into certain gas storage leases with those same persons. The individual plaintiffs are successors in title to the property owners who entered into those agreements with W.G. Rule and Cities Service Gas Company. W.G. Rule subsequently assigned his interests in the oil and gas leases to Cities Service Gas Company. WNG is the successor to Cities Service Gas Company.

In 1992 and 1993, the plaintiffs executed certain oil and gas leases with TWS. According to the plaintiffs, they entered those leases with TWS based upon their belief that the oil and gas leases executed in 1948 and 1949 expired by their own terms in 1958 and 1959. The plaintiffs seek declaratory judgment that the leases executed in 1992 and 1993 are valid and that the oil and gas leases executed in 1948 and 1949 have expired and are therefore no longer binding.

In contrast, WNG contends that the oil and gas leases executed in 1948 and 1949, which were executed at the same time as the gas storage leases, are still valid and enforceable. In short, the oil and gas leases did not expire in 1958 and 1959, but instead, have remained valid under the terms of certain provisions of the gas storage leases. Because WNG has abided by the terms of the gas storage leases, including the continued making of timely payments, the oil and gas leases executed in 1948 and 1949 are still enforceable. Consequently, the leases between TWS and the individual plaintiffs are merely topleases.

### Preliminary Matters:

### Plaintiffs' Motion to Supplement Memorandum in Support of Motion for Summary Judgment

On July 12, 1994, the plaintiffs filed a motion to supplement their memorandum in support of their motion for summary judgment. The memorandum in support of that motion directs the court's attention to a recent Kansas Court of Appeals case, *Eichman v. Leavell Resources Corp.*, 19 Kan.App.2d 710, 876 P.2d 171 (1994), which they believe to be relevant to the legal issues presented by this case. In that memorandum, the plaintiffs briefly discuss the significance of

that case within the context of the facts of this case.

WNG opposes the plaintiffs' motion, arguing that (1) the court's opinion in *Eichman* is essentially irrelevant to the issues raised in this case, and (2) the court should reject the plaintiffs' motion to the extent that it simply rehashes old arguments previously raised.

Counsel are always encouraged by the court to bring to its attention recent precedent relevant to pending matters. Notwithstanding WNG's objections, the court grants the plaintiffs' motion to supplement their memorandum in support of their motion for summary judgment to the extent that the court will, in ruling on the pending cross-motions for summary judgment, consider all of the relevant arguments and authorities contained in that memorandum.

### WNG's Motion to Strike Portion of Plaintiffs' Affidavits

As another preliminary matter, the court will turn to WNG's motion to strike portions of the affidavits filed by the plaintiffs in support of their motion for summary judgment. Specifically, WNG contends that the affidavits, or portions thereof, are not based upon personal knowledge, do not set forth facts as would be admissible in evidence, and do not set forth affirmatively that the affiant is competent to testify to the matters stated in the affidavit. WNG also argues that David B. Griffin's affidavit should be stricken in its entirety as irrelevant.

Fed.R.Civ.P. 56(e) states that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Similarly, D.Kan. Rule 206(c) requires the affidavits to be "made on personal knowledge and by a person competent to testify to the facts stated which shall be admissible in evidence."

Read together, these rules require that an affidavit must show that the affiant is competent to testify to the matters found in his affidavit. The affidavit must be based upon personal knowledge. It is the affiant's personal knowledge, and not his beliefs, opinions, rumors or speculation, that are admissible at trial and the proper subject of any affidavit. *See Malek v. Martin Marietta Corp.*, 859 F.Supp. 458, 460 (D.Kan.1994) (citing *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir.1989) ("A party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture.") and *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1367 (8th Cir.1983) ("Under Rule 56(e), an affidavit filed in support of or opposition to a summary judgment motion must be based upon the personal knowledge of the affiant; information and belief is insufficient." (citations omitted)).

Several of the plaintiffs aver that it is their opinion that upholding the validity of WNG's leases would be "unfair" as they have "never received a penny" from WNG or its predecessors for the oil and gas rights on their property. The plaintiffs also indicate that they are frustrated by the situation and that they desire TWS to prevail in this matter. While the plaintiffs are certainly entitled to their opinion concerning the equity of the situation, as are they entitled to hope to prevail in this lawsuit, such opinions and desires carry no probative weight in deciding their motion for summary judgment. Similarly, the plaintiffs' opinion that TWS's lease is valid and that WNG's lease is not is basically immaterial to deciding their motion for summary judgment as the plaintiffs' good faith is not at issue.[5] At this stage of the proceedings, if possible, the respective rights of the parties are to be determined by the court based upon the relevant uncontroverted facts and the applicable law.

To the extent that an affidavit is based upon the affiant's desires, beliefs, opinions, rumors or speculation, the court is compelled to enforce Rule 56(e) and disregard those portions of the affidavits filed by the plain-

---

**5.** Such an affidavit is little better than an affidavit in which a party merely states "I think I should win." Obviously, such an averment does not, in and of itself, create an issue of fact precluding summary judgment.

These portions of the plaintiffs' affidavits are of interest only to the extent that they provide a background to explain their personal actions and their motives for pursuing this case which might not otherwise be self-evident.

tiffs which fail to satisfy the requirements Rule 56(e) and D.Kan.Rule 206(c). As to Griffin's affidavit, the court has considered it to the extent that it is relevant and to the extent that it satisfies the requirements of Rule 56(e) and D. Kan.Rule 206(c).

## Uncontroverted Facts

When confronted with cross-motions for summary judgment, the court typically attempts to synthesize the uncontroverted facts into a single account that fairly and accurately states the relevant facts. In this case, that task has not been unduly burdensome as the parties' respective motions are largely based upon the same facts. Although the parties identify certain factual disputes,[6] the parties primarily dispute the legal consequence of the undisputed facts. Each side simply claims that they are entitled to summary judgment on the uncontroverted facts.

In setting forth the statement of uncontroverted facts, the court has attempted to streamline those facts to their most simple form.

1. Each of the individual plaintiffs are owners of real property in the McLouth Gas Storage Field.

2. Each of the current landowners' predecessors entered into an oil and gas lease with W.G. Rule in either 1948 or 1949. The habendum clause[7] of each of the oil and gas leases provided as follows:

This lease shall remain in force for a term of ten years and as long thereafter as oil, gas, casinghead gas, casinghead gasoline or any of the products covered by this lease is or can be produced.

3. Each of the current landowners' predecessors entered into a gas storage lease with Cities Service Gas Company (Cities Service Gas) in 1948 and 1949. Each of the gas storage leases contained the following relevant paragraphs:[8]

2. This lease shall remain in force for a term of ten years from this date and so long thereafter as said lands or lands in the vicinity thereof used or for use in connection therewith are being used or held by Second Party for gas storage purposes.

12. If at the expiration of the primary term of this lease, Second Party is using said lands, or lands in the vicinity thereof for gas storage purposes, Second Party may continue said lease from year to year by the continued payment of the annual rentals as above provided so long as said lands are by Second Party deemed necessary or convenient for Second Party's use in its gas storage operations in the field of which said lands are a part.

13. It is mutually understood that there is at present on the above described lands an oil and gas lease owned by W.G. Rule and that until said lease shall have been acquired by Second Party in whole or as to the gas rights and privileges incidental thereto to a depth of not less than twenty feet (20') below the top of the Mississippi Lime or until said lease shall lapse, be cancelled or otherwise terminate, actual gas storage operations will not be commenced by Second Party, unless said Second Party procures in writing from the owner or owners of said lease and all other

---

**6.** The plaintiffs attempt to controvert several of WNG's statements of uncontroverted facts. However, the plaintiffs fail on most occasions to present any evidence in support of the arguments they seek to advance to controvert those facts. Consequently, the court is compelled to accept most of WNG's statement of uncontroverted facts as uncontroverted.

**7.** A "habendum clause" is defined as the "clause in a deed or lease setting forth the duration of the grantee's or lessee's interest in the premises." *Manual of Oil and Gas Terms* at 554.

The habendum clause establishes the duration of the leasehold interest. Other clauses in the lease may limit or extend the lease term creat-

ed by the habendum clause.... The typical habendum clause provides for a definite term which may be extended for an indefinite period of time while production is obtained from the leased acreage. The definite term is called the "primary term" and the indefinite extension of the lease by production is called the "secondary term." The habendum clause consists of a "term clause," which states the primary term, and a "thereafter clause," which states the indefinite secondary term.

1 David E. Pierce, *Kansas Oil and Gas Handbook* § 9.21 at 9–18 (1986).

**8.** Under the agreements, the landowners are called the "First Party" and Cities Service Gas is called the "Second Party."

parties of interest in lessee's rights, agreements wherein Second Party is granted the privilege to enjoy the rights created by this instrument.

14. It is mutually understood that production under an oil and gas lease and storage and extraction of storage gas under a storage lease cannot be successfully carried on from the same sands at the same time and it is agreed that at any time when this storage lease is in good standing by reason of rental payments any valid oil or gas lease now upon said lands shall not be subject to attack on the ground of lack of production or of proper development as to the sands and depths involved herein but that proper operations under this lease or under such oil and gas lease shall keep such oil and gas lease in good standing and prevent lapse, abandonment charge or forfeiture.

14A. It is mutually understood that payment of rentals under this lease shall relieve the Lessee of paying rentals under the oil and gas lease.

. . . . .

4. WNG is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Tulsa, Oklahoma. WNG is the successor to Cities Service Gas Company, and has also formerly been known as Northwest Central Pipeline Corporation.

5. Each of the oil and gas leases executed by landowners in favor of W.G. Rule were subsequently assigned from W.G. Rule to WNG's predecessor, Cities Service Gas.

6. The parties have submitted to the court true and correct copies of the oil and gas leases and assignments. The parties have also submitted to the court true and correct copies of the above gas storage leases.

7. In 1948 and 1949, each landowner signed the oil and gas lease and the gas storage lease on the same day, and before the same notary public.

8. Cities Service Gas paid the signing bonus direct to each landowner, not only for the gas storage leases where Cities Service Gas was the lessee, but also for the Oil and Gas Leases where W.G. Rule was the named lessee.

9. Mr. Eric C. Steeper, a vice-president of the Bank of McLouth (the depository bank for payment of rentals under the oil and gas leases and the gas storage leases), was paid by Cities Service Gas to acquire the oil and gas leases.

10. The gas storage leases and the oil and gas leases were executed as a part of the same transaction.

11. WNG and its predecessors have paid all of the annual rental payments due under the gas storage leases covering the properties owned by the plaintiffs and their predecessors.[9]

12. The properties located within the McLouth Gas Storage Field operated by WNG and certificated by the Federal Energy Regulatory Commission (FERC), and WNG and its predecessors have conducted, and continue to conduct, gas storage operations on the property pursuant to the gas storage leases.

13. WNG nor its successors have commenced exploration or drilling operations on the individual plaintiffs' property at any time. However, the oil and gas leases owned by WNG are covered by a farmout agreement between WNG and KLM Exploration, Inc., dated August 28, 1992, as it may have been amended by letters and/or amendments dated August 24, 1993, and November 10, 1993.

14. TWS is a corporation organized and existing under the laws of Kansas, with its principal place of business in Kansas. TWS has obtained certain oil and gas leases from the current landowners. The parties have

---

9. The plaintiffs argue that certain payments made by WNG were "late." However, the only payments that were not made in a timely fashion were on occasions when ownership of the land was transferred or when the owner of the land died. Any delay in making a timely payment to the true owner appears have been caused by WNG waiting to receive proper documentation evidencing the true owner of the property. In any event, WNG has apparently paid all amounts due under the contract, and all of the plaintiffs have accepted all of those payments, including the payments which they now claim to have been untimely.

submitted true and correct copies of those leases, as they have been amended or modified.

15. WNG's gas storage leases, oil and gas leases, and assignments, were a matter of public record at the time TWS obtained its leases from the individual plaintiffs.

16. By their own terms, the terms and conditions of WNG's oil and gas leases and the gas storage leases are binding on all successors of the original landowners who executed those instruments.

17. None of the individual plaintiffs have received any separate rental or royalty payments under the oil and gas leases from WNG.[10] WNG has made other payments to their predecessors in title concerning mineral rights on the property.

18. At this time, there is no actual production of oil or gas from the properties.

19. Cities Service Gas' official company records indicate that the leases entered into by the plaintiffs' predecessors would expire in either 1958 or 1959.

20. TWS plans to drill in the McLouth Sandstone to explore for oil on the individual plaintiffs' properties. The McLouth Sandstone is within the level covered by the gas storage agreements held by WNG.

21. Other wells drilled in the area surrounding the individual plaintiffs' property have apparently proven to be financially successful.

### Legal Standards for Interpreting Oil and Gas Leases

"Under Kansas law, the principal rule in construing oil and gas leases is to deduce the intent and purpose of the parties involved by 'examining the document[s] from all four corners.'" *Reese Exploration v. Williams Natural Gas*, 983 F.2d 1514, 1519 (10th Cir. 1993).[11] "This approach requires consideration of all the lease provisions in a manner which construes the language harmoniously and reasonably." *Id.*

These rules of interpretation are based upon the same general principles governing the interpretation of all contracts in Kansas. "The primary rule in construction of any contract is to ascertain the intent of the parties, and such intent may best be determined by looking at the language employed and taking into consideration all the circumstances and conditions which confronted the parties when they made the contract." *City of Arkansas City v. Anderson*, 242 Kan. 875, Syl. ¶ 3, 752 P.2d 673 (1988). "The doctrine has been well established and frequently applied that where parties have carried on negotiations, and have subsequently entered into an agreement in writing with respect to the subject matter covered by such negotiations, the written agreement constitutes the contract between them and determines their rights." *Hall v. Mullen*, 234 Kan. 1031, 1037, 678 P.2d 169 (1984). "If a written contract is actually ambiguous concerning a specific matter in the agreement, facts and circumstances existing prior to and contemporaneously with its execution are competent to clarify the intent and purpose of the contract in that regard but not for the purpose of varying and nullifying its clear and positive provisions." *Id.* "A court may, in construing an ambiguous or indefinite contract, take into consideration the conduct of the parties as evidence of their interpretation of the document, provided that interpretation is not inconsistent with the language of the contract." *First Nat'l Bank of Olathe v. Clark*, 226 Kan. 619, Syl. ¶ 7, 602 P.2d 1299 (1979).

The construction of a written instrument is a question of law, *see Reese Exploration*, 983 F.2d at 1518; *Akandas, Inc. v. Klippel*, 250 Kan. 458, Syl. ¶ 1, 827 P.2d 37 (1992), and the interpretation of a written contract which is free from ambiguity is a judicial function. *See Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, Syl. ¶ 1, 738 P.2d 866 (1987).

---

**10.** It is WNG's contention, and the primary issue in this litigation, that the payments under the gas storage leases relieve it from any separate obligation to make payments under the oil and gas leases.

**11.** As jurisdiction in this case is based solely upon diversity, the court must apply the law of Kansas. *Reese Exploration,* 983 F.2d at 1519.

 If a contract is unambiguous, the contract should be enforced according to its terms. Language in a contract is ambiguous if the words in the contract are subject to two or more possible meanings. *Harder v. Wagler,* 17 Kan.App.2d 403, Syl. ¶ 1, 838 P.2d 366, *rev. denied,* 251 Kan. 938 (1992); *NEA-Goodland v. U.S.D. No. 352,* 13 Kan.App.2d 558, 562, 775 P.2d 675 (1989). The court need not look beyond the four corners of the contract where the parties have reduced their agreement to written form and the document is unambiguous on its face. *Koch v. Koch,* 903 F.2d 1333 (10th Cir.1990). "Reasonable rather than unreasonable interpretations of contracts are favored and results which vitiate the purpose or reduce the terms of a contract to an absurdity should be avoided." *Kansas State Bank & Trust v. DeLorean,* 7 Kan.App.2d 246, Syl. ¶ 4, 640 P.2d 343 (1982). The Tenth Circuit has recognized "the universal rule that courts will not make contracts under the guise of judicial interpretation, but must enforce them in accordance with their clear and unambiguous language." *Phico Ins. Co. v. Providers Ins. Co.,* 888 F.2d 663, 667 (10th Cir.1989).

 "Where two or more instruments are executed by the same parties at or near the same time in the course of the same transaction and concern the same subject matter, they will be read and construed together to determine the intent of the parties." *City of Arkansas City,* 242 Kan. 875, 752 P.2d 673, Syl. ¶ 4.[12] Similarly, "[d]ocuments which are executed at different times, but in the course of the same transaction concerning the same subject matter, will be construed together to determine the intent of the parties to the contract." *Hollenbeck v. Household Bank,* 250 Kan. 747, 752, 829 P.2d 903 (1992) (citing *West v. Prairie State Bank,* 200 Kan. 263, 267, 436 P.2d 402 (1968)). This rule is applied even though the instruments do not specifically refer to each other. *Century Refining Co. v. Hall,* 316 F.2d 15, 21 (10th Cir.1963) (quoting *Shepard v. John Hancock Mutual Life Ins. Co.,* 189 Kan. 125, 368 P.2d 19 (1962)).

12. "This rule should also apply if the parties involved comply with the provisions of interrelated documents although one of the documents was not executed by a party to the transaction." *Atlas Industries, Inc. v. National Cash Register Co.,* 216 Kan. 213, 220, 531 P.2d 41 (1975).

## Analysis

To a large extent, the parties discuss the same legal issues in the presentation of their motion for summary judgment as they do in responding to the opposing sides' motion. The court has carefully reviewed all of the briefs filed by the parties and has considered all of the arguments advanced by the parties in those briefs in deciding these cross-motions. In this memorandum and order the court has endeavored to address the key arguments advanced by each party.

## Construction of the Oil and Gas Leases and the Gas Storage Leases

1. Should the oil and gas leases and the gas storage leases be construed together?

 The plaintiffs contend that the parties who entered the oil and gas leases and the gas storage leases in 1948 and 1949 intended to create two separate agreements, thereby requiring specific performance under both agreements. WNG disagrees, arguing that it is absolutely clear from the express terms of the agreements that the parties intended the oil and gas leases and the gas storage leases to be considered as one transaction and that the terms of the gas storage leases are intended by the parties to modify and amend the habendum clause of the oil and gas leases.

Based upon the uncontroverted facts and the express terms of the agreements, it is clear that the oil and gas leases and the gas storage leases should be construed together. The oil and gas leases and the gas storage leases are either part of the same transaction, or the gas storage leases were entered with the specific intent to amend and modify the oil and gas leases. Under either scenario, the oil and gas leases and the gas storage leases are properly construed together to determine the intent of the parties in 1948 and 1949.

2. Has there been a severance of the oil and gas rights from the gas storage rights?

 In reliance upon the Supreme Court of Kansas' decision in *Rook v. Russell Petro-*

*leum, Inc.,* 235 Kan. 6, 679 P.2d 158 (1984), the plaintiffs argue that WNG's performance under the gas storage leases does not suffice as performance under the oil and gas leases. Based upon their reading of *Rook,* the plaintiffs contend that the rights and duties under the oil and gas leases and the gas storage leases were severable, and that WNG's failure to perform under the terms of the oil and gas leases is not saved by WNG's performance under the gas storage agreements.

WNG responds, arguing that the plaintiffs' have misread and misinterpreted *Rook.* WNG contends that *Rook,* if anything, supports its position. WNG contends that *Rook* is an abandonment case, and that the express language of the agreements in this case forecloses such an argument.

In *Rook,* one tract of property was covered by an oil and gas lease entered in 1921. A supplemental lease was executed on the same tract in 1936. The supplemental agreement expanded the terms of the original lease by allowing the property to be used for storage and removal of natural gas. At the same time the supplemental agreement pertaining to the first tract was executed, a separate oil, gas and underground storage lease was entered on another tract of land. The agreements contained clauses which extended the term of the interest beyond the primary term and as long thereafter as (1) oil or gas is produced on the property and/or (2) the gas storage rights are exercised and/or (3) the storage rental are being paid.

Originally, the oil and gas leases and the gas storage leases were held by one person named W.S. Fees. Fees subsequently assigned his gas production and gas storage rights to Cities Service Gas Company. The oil and gas leases were specifically reserved to Fees. Fees subsequently assigned his rights and interests in the oil and gas leases to James E. Russell, who subsequently transferred them to James E. Russell Petroleum, Inc. in 1963. James E. Russell Petroleum ceased production on those wells on the two tracts of land in 1966.

In 1980, the landowners brought suit against James E. Russell Petroleum, alleging that a fifteen year period of lack of production or active exploration constituted abandonment. James E. Russell Petroleum contended that its interests in its oil and gas wells were protected while not developing or producing by the habendum clause contained in the leases, in that as long as the gas storage rentals were paid to the landowner by Cities Gas Service that it could postpone resuming production until the most economically advantageous time. 235 Kan. at 11, 679 P.2d 158.

The trial court held that the leases were still in effect by the terms of the habendum clause based upon the continuous storage of natural gas on the property and payment of the gas storage rental. 235 Kan. at 12, 679 P.2d 158. On appeal, neither party challenged that ruling. 235 Kan. 13. The trial court went on to hold, however, that the provisions of the leases were divisible, and that the oil and gas production portion of the lease could be forfeited for failure to comply with the implied covenants to act as a diligent and prudent operator, while the gas storage rights remained intact. 235 Kan. at 12, 679 P.2d 158. Specifically, the trial court found that the oil and gas production portion of the leases was severable from the gas storage rights held by Cities Service Gas. The trial court terminated the oil and gas leases based upon its finding that James E. Russell Petroleum had abandoned them, and that determination was affirmed by the Kansas Supreme Court.

*Rook* is distinguishable from the case at bar in that WNG nor its predecessor assigned its oil and gas rights to another party, nor was there a severance of those rights from its gas storage rights. Based upon the express terms of the agreements, because the gas storage leases are in good standing, the oil and gas leases are not subject to attack on the basis of lack of production or failure to develop. *See Tate v. Stanolind Oil & Gas Co.,* 172 Kan. 351, 355, 240 P.2d 465 (1952) ("The great weight of authority, however, appears to be in harmony with the view that actual production during the primary term is essential to the extension of the lease beyond that fixed term. This, at least, is true unless the lease contains some additional provision indicating an intent to extend the right to produce beyond the primary term.").

3. Is there any ambiguity in either the oil and gas leases or the gas storage leases?

■ Although the plaintiffs appear to argue that the gas storage leases are somehow ambiguous, they fail to articulate in any meaningful fashion the ambiguity they claim exists. The plaintiffs simply argue that it is illogical for the parties to have intentionally destroyed the time limitations set forth in the oil and gas leases. WNG responds, arguing that the plaintiffs have failed to point to any ambiguous portion of the agreements. In regard to paragraph 14A, WNG states "How could the language be any clearer?"

■ The court concludes that the 1948 and 1949 agreements between the parties are not ambiguous. The plaintiffs' inability to articulate with any degree of precision the portions of the agreements which they claim to be ambiguous supports this conclusion. As to the plaintiffs' claim that paragraphs 14 and 14A are illogical, the court simply notes that "Kansas follows the general principle that 'competent parties may make contracts on their own terms, provided they are neither illegal nor contrary to public policy.' " *Anderson v. Union Pacific R.R. Co.*, 14 Kan. App.2d 342, 343, 790 P.2d 438 (quoting *Adams v. John Deere Co.*, 13 Kan.App.2d 489, 492, 774 P.2d 355 (1989)), *rev. denied*, 246 Kan. 766 (1990); *see Endicott v. DeBarbieri*, 189 Kan. 301, Syl. ¶ 2, 369 P.2d 241 (1962) ("[P]arties have the right to make their own lawful contract, and to have such contract enforced as written.").

■ In addition to their argument that the agreements are ambiguous, the plaintiffs suggest in the alternative that if the court construes paragraph 14 and 14A as written, "then there is the strong implication of an adhesion contract." WNG responds, arguing that there is absolutely no evidence to support the plaintiffs' contention that the leases entered in 1948 and 1949 were adhesion contracts.

An adhesion contract has been defined as an agreement "in which one party's participation consists in his mere 'adherence,' unwillingly and often unknowing, to a document drafted unilaterally and insisted upon by what is usually a powerful enterprise."

*Steele v. J.I. Case Co.*, 197 Kan. 554, 561, 419 P.2d 902 (1966) (quoting Albert A. Ehrenzweig, *Adhesion Contracts in the Conflict of Laws*, 53 Colum.L.Rev. 1072, 1075 (1953)); *see Penalosa Co-op Exchange v. Farmland Mut. Ins. Co.*, 14 Kan.App.2d 321, Syl. ¶ 5, 789 P.2d 1196 (insurance contracts are typically adhesion contracts in which the terms are drafted by the insurer and not negotiated between the parties) *rev. denied*, 246 Kan. 768 (1990).

In this case, the plaintiffs have failed to present any facts upon which to base their claim that the agreements entered in 1948 and 1949 should be characterized as adhesion contracts. In the absence of any factual basis for such a claim, the plaintiffs' suggestion that the contracts are adhesion contracts is little more than rank speculation. In short, there is nothing to indicate that the unambiguous agreements reached in 1948 and 1949 were not the product of an arms length transaction between competent parties.

4. Did paragraph 14A in the gas storage leases only extend the gas storage leases indefinitely (meaning that the oil and gas leases would only be extended by actual production)?

■ The plaintiffs argue that "nothing in either lease on any of the relevant tracts suggests that clause 14A was meant to do anything more than to excuse the delay in rental payments under the oil and gas leases later assigned to the gas storage lessee. Therefore, it follows that a generous reading would at most yield the conclusion that the gas storage payments were operating only as the delay rental payments under the oil and gas leases." The plaintiffs contend that Kansas courts have consistently interpreted the typical production clause to require nothing short of actual production to extend the lease past its primary term. As that requirement was not met in this case, each lease expired by its own terms at the end of each of the respective ten year terms unless there is an additional term evidencing the intent to extend the lease. The plaintiffs contend that the delay rental clause cannot function to extend the length of the lease beyond the primary term of the lease.

WNG responds, arguing that the plaintiffs' analysis completely ignores the express terms of the agreements. Under paragraph 14A, the parties agreed that *"at any time when this storage lease is in good standing by reason of rental payments any valid oil and gas lease now on said lands shall not be subject to attack"* for lack of production or proper development. Because paragraph 14A is not limited to the primary term of ten years, it applies to the oil and gas leases beyond 1958 and 1959. Had the parties intended to limit paragraph 14A to the primary term, they would have so stated.

The court concludes, based upon the plain language of the agreements, that the oil and gas leases extend beyond the ten year primary term and continue in full force.

### Other Challenges to the Enforcement of the Contracts

1. Do paragraphs 14 and 14A of the gas storage lease violate the public policy of Kansas?

■ The plaintiffs contend that paragraphs 14 and 14A of the gas storage leases violate the public policy of Kansas and therefore should not be enforced. The plaintiffs contend that it is the public policy of the State of Kansas to encourage the development of oil and gas leases, and that the operation of paragraphs 14 and 14A effectively thwarts that policy. As evidence of this public policy, the plaintiffs note that the Kansas courts have long implied a covenant to develop oil and gas leases, *see, e.g., Shaw v. Henry*, 216 Kan. 96, 531 P.2d 128 (1975), and that the Kansas legislature recently adopted the Kansas Deep Rights Act, which implies a covenant to develop in all oil and gas leases,

*see* K.S.A. 55–223.[13] The plaintiffs suggest that this public policy is served by invalidating the 1948 and 1949 oil and gas leases.

WNG responds, arguing that express terms of the agreement dictate the respective rights and obligations of the parties. WNG argues that the leases should simply be enforced by their own terms. In regard to the Kansas Deep Rights Act, WNG contends that the Act, which was passed over thirty-five years after the disputed oil and gas leases were executed in this case, does not affect substantive rights and remedies. WNG also contends that the statute does not operate as a bar or prohibit express covenants or agreements regarding further development.

■ The court concludes that enforcement of the oil and gas leases executed in 1948 and 1949 does not violate the public policy of Kansas. As the court has noted throughout this opinion, in Kansas, competent parties are generally free to make lawful contracts on their own terms. This observation applies equally to oil and gas leases.

> Although courts express a policy favoring development to protect the lessor's expectations under the lease, the "policy" is one of construction and not a "public policy." If the parties to the lease have expressly stated the extent of lessee's development obligations, such express covenants will control. *See, e.g., Skinner v. Ajax Portland Cement*, 109 Kan. 72, 197 P 875 (1921) (no implied covenant to drill test well under oil and gas lease with 99 year fixed term and express provision making it optional with lessee when it will drill).

13. K.S.A. 55–223 provides:
> As a matter of Kansas public policy, all oil and gas leases and subleases for the exploration, development and production of oil, gas or other minerals, or any combination thereof, which are held by production shall be presumed to contain, in addition to any expressed covenants therein, an implied covenant to reasonably explore and to develop the minerals which are the subject of such lease. Such implied covenant shall be a burden upon the lessee and any successor in interest.

K.S.A. 55–228 provides:
> As created by this act, it shall be against Kansas public policy to provide for a waiver of the

presumption, established by K.S.A. 55–223, in any lease or sublease for the exploration, development or production of oil, gas or other mineral, or any combination thereof.

K.S.A. 55–229 provides:
> This act shall not alter or affect substantive rights or remedies under any such mineral leases under the common law or statutes of the state of Kansas. The evidentiary presumption afforded by this act shall be cumulative and in addition to all other substantive rights and remedies in existence under the common law and statutes of this state on the effective date of this act.

1 *Kansas Oil and Gas Handbook* § 10.01 at 10–4. Therefore, the express provisions of the agreements in the case at bar would not contravene the general public policy favoring development.

"The Kansas Legislature as a matter of public policy has by statute included the implied covenant to explore and develop all oil and gas leases when such covenants are not contained in the lease." *Robbins v. Chevron U.S.A., Inc.,* 246 Kan. 125, 131, 785 P.2d 1010 (1990). However, K.S.A. 55–229 "expressly states that substantive rights and remedies will not be altered or affected by the Deep Rights Act." *Amoco Production Co. v. Douglas Energy Co., Inc.,* 613 F.Supp. 730, 737 (D.Kan.1985). By its own terms, the Act only prohibits the inclusion of a waiver of the presumption established by K.S.A. 55–223 in any lease or sublease for the exploration, development or production of oil, gas or other mineral. The court concludes that the Kansas Deep Rights Act does not provide a justification or basis to invalidate the express terms of the 1948 and 1949 agreements.

2. Was consideration paid for the execution of the gas storage leases?

■ The plaintiffs argue that when the gas storage leases were executed, no separate or additional consideration, beyond the amounts paid for the gas storage leases, was paid for the inclusion of paragraphs 14 and 14A (which modified the terms the oil and gas leases). The plaintiffs contend that the consideration paid for the gas storage leases was only sufficient to support those leases, and because no additional consideration was paid for paragraphs 14 and 14A, those provisions of the gas storage leases are unenforceable.

WNG responds, arguing that there is no legal authority supporting the argument advanced by the plaintiffs. WNG contends that because separate consideration was paid for the gas storage leases, consideration was paid for each provision of the gas storage leases, including paragraphs 14 and 14A. WNG also notes that plaintiffs and their predecessors in title have received twice as much compensation in the way of annual payments under the gas storage leases as

WNG was to pay under the oil and gas leases.

■ "Every contact requires consideration to be enforceable." *First Nat. Bankshares of Beloit, Inc. v. Geisel,* 853 F.Supp. 1344 (D.Kan.1994) (citations omitted). An agreement to modify a contract must be supported by independent consideration. *Marsh v. Coleman,* 774 F.Supp. 608, 616 (D.Kan.1991) (citing *Bloch v. Fedak,* 210 Kan. 63, 65, 499 P.2d 1052 (1972)). "Consideration is a benefit to the promisor or a loss or detriment to the promisee." *Flight Concepts Ltd. Partnership v. Boeing Co.,* 819 F.Supp. 1535, 1553 (D.Kan.1993) (citing *Coder v. Smith,* 156 Kan. 512, 134 P.2d 408, 409 (1943), *aff'd,* 38 F.3d 1152 (10th Cir.1994)). "Mutual promises and the acceptance of benefits, however small, constitute valid consideration." *Flight Concepts Ltd. Partnership,* 819 F.Supp. at 1553 (citing *In re Goff's Estate,* 191 Kan. 17, 379 P.2d 225, 236 (1963)). "Under Kansas statutes, it is presumed that consideration has been given in support of a written contract." *First Nat. Bankshares of Beloit,* 853 F.Supp. at 1352.

As WNG suggests, the plaintiffs have identified no authority in support of their "separate consideration" argument. The court concludes that the gas storage leases are supported by consideration and that such consideration is sufficient to support the provisions of those agreements, including paragraphs 14 and 14A.

3. Did WNG's "late" rental payments pursuant to the terms of the gas storage agreement cause the oil and gas leases to automatically expire?

■ The plaintiffs argue that WNG's late rental payments on certain occasions has caused the oil and gas leases to automatically expire. WNG responds, arguing that it has never made any "late" payments under the terms of the agreements. WNG argues that even if it has made late payments within the meaning of the agreements, that under the terms of the agreements, the oil and gas leases did not automatically expire. WNG contends that the gas storage leases are clearly "or"-type leases, and not "unless"-type leases and therefore they have not terminated. In conclusion, WNG states:

In this case, no landowner has made any claim against WNG for failure to make rental payments. No legal actions have been commenced for any alleged failure to pay rentals. On the contrary, all current landowners have received and negotiated the rental check from WNG for the most recent rentals due on their property, and there is no allegation that the gas storage leases have been terminated.... Therefore, the oil and gas leases have likewise not been terminated by virtue of any alleged late payment of rentals.

WNG's response brief (Dk. 63) at 25. The plaintiffs have presented nothing to dispute these arguments and factual assertions by WNG.

Paragraphs 3, 4 and 11 of the gas storage leases provide in pertinent part:

3. On or before one year after the date hereof and annually thereafter until Second Party shall relinquish this lease as hereinafter provided Second Party shall pay or tender by check or draft to First Party or to the credit of First Party in the Bank of McLouth Bank of McLouth, Kansas, which bank and its successors are the First Party's agents and shall continue as a depository of all payments under this lease regardless of change of ownership of the lands, the sum of [dollar amount of rent] as rental to cover all the storage privileges herein granted for the next succeeding twelve months (12 mos.) ...

4. Second Party shall not be bound by any change in ownership of said lands or assignment of rentals or other payments hereunder until after Second Party shall have been furnished with duly recorded transfer or assignment or certified copies thereof.

. . . . .

11. Second Party may surrender this lease in whole or in part at any time by filing for record in the office of the Register of Deeds of said County and State a release in writing duly executed and acknowledged, after which all payments and liabilities thereafter to accrue as to the party released shall cease and determine.

The plaintiffs have not demonstrated that any of WNG's payments were actually "late" under the express terms of the agreements. Nor have the plaintiffs demonstrated that had WNG made late payments, that the oil and gas leases and gas storage leases would have automatically terminated. As WNG argues, it appears that the gas storage leases, which essentially control the terms of the agreements, are "or" type leases rather than "unless" type leases. Professor Pierce explains the distinction between the two types of leases:

Two general types of drilling/delay rental clauses are encountered in Kansas. One type is called an "or lease" clause, the other is called and "unless lease" clause. The two major distinctions between the *or* and *unless* clauses concern whether there is an obligation to pay the delay rental and what happens when the delay rental is not properly paid. Under the *or* type drilling/delay rental clause the lessee is obligated to pay the rental unless he commences operations on the lease or surrenders the lease prior to the delay rental due date. *Shertzer v. Myers*, 82 Kan. 275, 108 P. 105, 106 (1910) (action to recover delay rental). If the lessee fails to make a delay rental payment, the lessee violates a covenant and is subject to having the covenant enforced or the lease canceled. *Kansas Natural Gas Company v. Harris*, 70 [79] Kan. 167, 172, 100 P. 72, 73 (1908). Under the *unless* type drilling/delay rental clause, there is no obligation to pay the delay rental. *Stady v. Texas Company*, 150 Kan. 420, 426, 94 P.2d 322, 326 (1939). However, if payment is not properly made when due, the lease automatically terminates. *Doornbos. v. Warwick*, 104 Kan. 102, 103–04, 177 P. 527, 528 (1919).

. . . . .

Most *or* leases also contain a clause permitting the lessee to surrender his lease prior to the delay rental due date. This permits the lessee to avoid the obligation to pay delay rental. However, if lessee fails to surrender the lease prior to the delay rental due date, the lessee becomes obligated to pay delay rental falling due prior to effective surrender of the lease.

*Myers,* 82 Kan. at 279, 108 P. at 106. A typical surrender clause provides:

> [Lessee] ... shall have the right at any time, on the payment of One ($1.00) Dollar to ... [Lessor], to surrender this lease for cancellation after which all payments and liabilities thereafter to accrue under and by virtue of its terms shall cease and determine.

*Benson v. Nyman,* 136 Kan. 455, 457, 16 P.2d 963, 964 (1932). Since the typical *unless* lease does not obligate the lessee to pay, and can be terminated automatically by a failure to pay, a surrender clause would appear to be unnecessary.

1 *Kansas Oil and Gas Handbook,* § 9.29 at 9–37 through 9–38.

Under these legal principles, assuming, arguendo, that WNG was late in making certain payments, that fact in and of itself would not cause the agreements to automatically terminate. The court concludes that these arguments are not a proper basis to invalidate the 1948 and 1949 agreements.

4. Are the official records of Cities Service Gas relevant to interpreting the contractual agreements entered in 1948 and 1949?

The plaintiffs contend that the court, in determining the duration of the agreements executed in 1948 and 1949, should consider certain statements found in Cities Service Gas' official records indicating that those agreements expired in 1958 and 1959. The summary notations in Cities Service Gas' records indicate that the agreements between the parties expired in 1958 and 1959.

WNG responds, arguing (1) that in the absence of any ambiguity in the oil and gas leases and the gas storage leases, the interpretation of those agreements is to be determined solely from the face of those documents, and (2) that even if the court were to consider those notations, they are merely simple summaries of the leases on an internal company form, and not a "full-blown admission." WNG also notes that if extrinsic evidence is admissible, the court should consider a letter from TWS' attorney to WNG, in which TWS's attorney refers to TWS' leases with the individual plaintiffs' as topleases.

As the court has previously noted, the 1948 and 1949 agreements are not ambiguous. Consequently, the court must look only to the terms of the agreements to determine the rights and obligations of the parties. *See Reese Exploration,* 983 F.2d at 1519 ("In interpreting ambiguous documents courts may consider the parties' conduct as an indication of their contracting intent."); *Flight Concepts Ltd. Partnership v. Boeing Co.,* 819 F.Supp. 1535, 1542 (D.Kan.1993) ("Parol evidence concerning the terms of an agreement is not admissible in the absence of ambiguity or fraud."). Cities Service Gas internal memoranda indicating that the agreements terminated in 1958 and 1959 do not create a genuine issue of material fact precluding summary judgment.

In sum, the court grants WNG's motion for summary judgment and denies the plaintiffs' motion for summary judgment. Although the plaintiffs will obviously see this as an unfair result, the court simply notes that WNG's gas storage leases and oil and gas leases are matters of public record. While the individual plaintiffs indicate they have never received a penny for WNG's oil and gas leases, that claim is belied by the fact that the plaintiffs have apparently enjoyed the benefit of the rental income from the gas storage agreements.

IT IS THEREFORE ORDERED that the court *sua sponte* sets aside its order of October 28, 1994, and considers WNG's motion for summary judgment on the merits.

IT IS FURTHER ORDERED that WNG's motion for summary judgment (Dk. 55) is granted.

IT IS FURTHER ORDERED that the plaintiffs' motion for summary judgment (Dk. 57) is denied.

IT IS FURTHER ORDERED that the plaintiffs' motion to supplement memorandum in support of motion for summary judgment (Dk. 68) is granted to the extent set forth in the body of this opinion.

IT IS FURTHER ORDERED that WNG's motion to strike portions of plaintiffs'

affidavits (Dk. 64) is granted to the extent set forth in the body of this opinion.